Filed 12/2/13  P. v. Garner CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARK E. GARNER,<br><br>    Defendant and Appellant. | F064368<br><br>(Madera Super. Ct.<br>No. MCR035492)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Mitchell C. Rigby, Judge.

Susan Pochter Stone, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Charles A. French, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Appellant/defendant Mark E. Garner met with a psychologist on April 24, 2009, and disclosed that he had been having sex with his 27-year-old daughter, Jane, for at least

10 years.[1] Defendant said Jane lived in his house, she was developmentally disabled, and he might have fathered a child with her in 2004. Defendant also said he had sex with her the previous night, and he was concerned it would happen again. The psychologist immediately reported defendant's confession to the Madera County Sheriff's Department. In the meantime, defendant repeated various aspects of his confession to his sister, his adult son, and one of his adult stepsons. His son (Jane's brother) immediately removed her from defendant's house, and Jane tearfully told him that defendant had been "messing" with her. It was later determined that defendant was not the father of Jane's child.

Defendant was charged with eight felonies based on the sexual molestation of Jane. The counts were based on two separate incidents, alleged to have occurred in 2004, and in April 2009. At trial, the prosecution introduced evidence that defendant had sexually molested his other two daughters when they were children. Despite his confession to the psychologist, defendant testified the psychologist did not understand what he told her. Defendant claimed he never said he had sex with Jane or he may have fathered her child. Defendant further testified his son and sister falsely claimed he confessed, there were family conflicts between them, and he never molested his other daughters.

During defendant's jury trial, the court dismissed two counts. Thereafter, defendant was convicted of committing the following offenses against Jane, on or about and between April 12 and April 25, 2009: count V, rape by force or fear (Pen. Code,[2]

---

[1] "Jane" is not the victim's true name. The record implies that the superior court ordered all pleadings and the reporter's transcript to use "Jane" in place of victim's name throughout the record. The parties have continued to identify the victim as "Jane" in their appellate briefs, and we will also do so for consistency. As we will explain, we will abbreviate other family names for reasons of privacy.

[2] All further statutory citations are to the Penal Code unless otherwise indicated.

§ 261, subd. (a)(2)); count VI, rape of a person incapable of giving legal consent because of a mental disorder or a developmental and physical disability (§ 261, subd. (a)(1)); and count VIII, incest (§ 285). The jury was deadlocked on three other counts. Defendant was sentenced to the maximum term of eight years in prison.

On appeal, defendant contends count VI must be reversed because there is insufficient evidence that Jane's developmental disability rendered her incapable of consenting to sexual intercourse; the court improperly imposed a presentence report fee without determining defendant's ability to pay; and the court improperly prohibited visitation between defendant and Jane.

We strike the visitation order, remand the matter for the court to determine if another visitation order is appropriate, and otherwise affirm.

## FACTS

Defendant and his first wife had four children: a son, M.G.; and three daughters: Jane, M.Ga. and M.Gr.[3] Jane was developmentally disabled and could not take care of herself. Defendant and his first wife separated when the children were young, and he obtained custody of them. Defendant and the children originally lived in Delhi and Modesto, and moved to Illinois and perhaps Missouri and Oklahoma. They returned to California and lived in Easton and then Chowchilla.

M.G. (Jane's brother) was 30 years old at the time of trial. M.G. testified that when the family lived in Easton, Child Protective Services removed all the children from defendant's home. At the time, M.G. did not know why they were taken from defendant. After three months, defendant regained custody of M.G. and his sisters. When they returned to defendant's custody, M.G. asked defendant what happened. Defendant said

---

[3] We have abbreviated the names of Jane's adult siblings for privacy reasons.

the children's natural mother "was making up a bunch of charges to take us away from him."**4**

M.G. moved out of defendant's house when he was 16 years old. Around the same time, two of his sisters—M.Ga. and M.Gr.—left defendant's house and moved in with their mother in Stockton. Defendant told him that his sisters ran away, and their mother was trying to "make stuff up again to get them away from him."**5** Jane continued to live with defendant because she could not take care of herself.

Since 2001, M.G. worked with defendant at his heavy equipment repair shop. M.G. owned a small percentage of the business. However, M.G. did not have much contact with Jane because defendant and his stepmother "kept her away from us. She always had something she was doing…."

**Jane's mental capacity**

As of 2009, Jane was 27 years old and lived in Chowchilla with defendant and his wife, who was Jane's stepmother. Some of the stepmother's adult children (Jane's stepsiblings) and young grandchildren also lived in the house.

Sharon Diaz, a social worker with Madera County Adult Protective Services, testified as an expert in assessing the competency of dependent adults. Ms. Diaz knew Jane personally and had regular contacts with her since 2004.

Ms. Diaz testified Jane's overall IQ was 61, which placed her "at the mild/moderate stage of developmental delays," and it was "pretty clear for most folks that her capacity is definitely in question." Jane had always lived with someone, and always

---

**4** Detective Clark of the Madera County Sheriff's Department testified that during his investigation in this case, he attempted to obtain the records regarding the removal of defendant's children, but he could not find any documentation about the incident.

**5** As we will discuss below, the prosecution introduced testimony pursuant to Evidence Code section 1108, that Jane's sister—M.Ga. and M.Gr.—ran away from home because defendant repeatedly sexually molested them when they were children.

had someone supervising her. She had difficulty signing her name, and her reading skills were very limited. Although Jane graduated from high school, she received a diploma through the special education program, and it was based on different requirements than a regular diploma. She did not have to satisfy the same testing levels "to graduate as a normal, functioning adult would."

Ms. Diaz testified Jane did not have the ability or capacity to take care of herself independently. Jane could not care for her personal hygiene without being reminded to do so. She did not understand the consequences of certain things, such as how a fire could start from leaving on a burner. She would not be able to grasp the rules of the road or pass a driver's test. She could not manage the financial aspects of living alone, such as paying rent, buying groceries, and paying bills. She was unable to make change and did not have a realistic idea of what things cost.

## Jane's pregnancy

In 2004, Jane became pregnant. Defendant called his sister, Betty C., who was Jane's aunt, and told her about the pregnancy. Betty C. lived in San Diego, and defendant asked if she could find an adoptive family for Jane's child because they were not prepared to keep the child. Defendant thought the child's father was someone who had a similar mental capacity as Jane, and had taken advantage of her during one of Jane's "sleepovers" with friends from her "special school." Betty C. contacted a couple in Arizona, and they adopted Jane's child.

## DEFENDANT'S CONFESSION

This case began on April 24, 2009, when defendant met with Dr. Susan Streeter, a licensed clinical psychologist. He had called her the previous day and asked for an appointment as soon as possible. Dr. Streeter did not know defendant and had never treated him. When defendant arrived for the appointment, Dr. Streeter noticed his clothing was soiled, he smelled of alcohol, and he appeared to have been drinking. He spoke very rapidly, which seemed consistent with other problems such as possible

5.

substance-related symptoms. Defendant said he had been taking pain medication. However, defendant appeared alert and communicated without any problem.

Dr. Streeter advised defendant that their meeting would be confidential except for matters she was mandated to report, which included any disclosures about child, elder, and/or dependent-adult abuse. Dr. Streeter also gave defendant a written form explaining her duty for mandated reporting. Defendant signed the form and said he understood. Dr. Streeter took notes during the session.

Defendant told Dr. Streeter he had been having sex with his daughter for at least 10 years. Defendant said his daughter was 27 years old, and she was developmentally delayed and on "SSI." Defendant said his daughter's functional age was equal to a 16 or 17 year old.

Defendant said he had sex with his wife, but he had sex with Jane because he needed to have sex three or four times a day. Defendant said it was "like porn on the computer," and it was "like the thrill of being caught, but not being caught."

Defendant told Dr. Streeter that Jane had a child about four years earlier. He was not sure if he was the child's father. Defendant said his wife (Jane's stepmother) was also concerned that he might be the father, and that caused problems between them. Defendant said Jane's child was adopted by a friend in Arizona.[6]

Defendant told Dr. Streeter he made the appointment with her because it was urgent for him to stop. He had sex with Jane the previous night, and he was concerned that he would it happen again. Defendant said his wife accused him of doing something to Jane.

---

[6] During the investigation in this case, it was determined that defendant was not the father of Jane's child.

Dr. Streeter testified defendant made an appointment for another meeting, but he later cancelled. At some later point, defendant and a relative appeared at Dr. Streeter's office and asked for a copy of his records.[7]

**The investigation and defendant's arrest**

Later on April 24, 2009, Dr. Streeter called the Madera County Sheriff's Department, and reported defendant's confession that he was having sex with his 27-year-old daughter who was mentally disabled, and an incident happened the previous night.

Deputy Andrew Rodriguez went to defendant's house in Chowchilla and contacted defendant. He asked defendant to step outside while he separately interviewed defendant's wife (Jane's stepmother). Deputy Rodriguez asked the stepmother if something unusual happened the previous night. The stepmother said she was asleep on the couch and heard Jane's bed move. She saw Jane run out of the bedroom, go into the bathroom, and lock the door. The stepmother said defendant followed Jane out of the bedroom. The stepmother told defendant she did not know what was going on, but it wasn't right, and she would call the police if he did not stop. When Jane finally came out of the bathroom, the stepmother asked what happened and Jane said she just had to use the bathroom. The stepmother said Jane had the mindset of a 12 year old.

Deputy Rodriguez testified he spoke with A., the stepmother's daughter and defendant's stepdaughter. A. shared the bedroom with Jane, and she was also developmentally disabled. The stepmother said A. had the mindset of an eight year old.

---

[7] As we explain, *post*, defendant testified at trial that he never made the statements attributed to him by Dr. Streeter; he tried to talk to her about his stepdaughter, who was going through a difficult divorce; and Dr. Streeter misunderstood what he was talking about.

Rodriguez asked A. if she remembered anything about the previous night. A. said no. Rodriguez felt she was not able to understand what was going on.

Defendant was arrested that day, and he posted bail within a few hours. Defendant remained released on bail until the jury verdicts were returned.

**Defendant's statements to his stepson**

John J. is stepmother's adult son and defendant's stepson. John J. testified about a series of telephone calls that occurred one day, apparently around or about April 24, 2009. In the morning, he received a call from his brother Christopher, another of defendant's adult stepsons. Christopher told John: " 'Dad's a sick f**k.' " John testified that Christopher advised him that stepmother caught defendant coming out of Jane's room at night, and stepmother freaked out.

John testified the allegations were that defendant was having sex with Jane. Later that same day, however, defendant called John and said he was " 'sorry if this has caused your family any trouble' " but that " 'nothing happened.' "

John testified he spoke to defendant's son, M.G., the same day. M.G. said he talked to Jane, and she "came clean about the whole deal." John testified he received another call from defendant that night. Defendant said he had lied during their previous conversation, he had not been truthful, and "that something did happen." John testified that was the last time he ever spoke to defendant.

**M.G. talks to defendant and Jane**

M.G., defendant's son, testified that he was at work with defendant when he received a telephone call about certain information. The record implies this call occurred on or about April 24, 2009, prior to defendant's arrest. M.G. confronted defendant and asked if he had been having sex with Jane. Defendant said he would not do that and left.

M.G. drove to defendant's house, contacted Jane, and said they needed to talk. They got into M.G.'s car, and he asked Jane if there was anything she needed to tell him.

They had an emotional conversation, and Jane said defendant had been "messing" with her. M.G. testified:

> "[Jane] said my dad's been … was messing with her, and she tried to kick him off and he wouldn't stop. And then she started … crying. Then I started crying. And I told her that I would never let this happen to her again. And she was going to come live with me now. And she wanted to get her stuff and I told her, we'll buy her all new stuff. She ain't going back to the house. She's going to stay at my house and I'll protect her."

M.G. took Jane back to his own house and called defendant. He asked defendant why he lied about Jane. M.G. testified defendant said he was sorry for lying, and he had been lying to himself for a long time. Defendant said he had a problem since before M.G. was born, and that was why he went to a therapist that day, "to try and get help." M.G. testified Jane moved in with his family that day and never returned to defendant's house.[8]

## Defendant's statements to his sister

Betty C., defendant's sister and Jane's aunt, testified that in April 2009, she got a call from her nephew, M.G. M.G. was very upset, and told her about an allegation against defendant. M.G. said he had information from his stepbrother's wife, that defendant had been caught with Jane.[9] M.G. said he was going to get Jane and have her stay with him.

---

[8] M.G. testified that he worked for defendant for another year while he tried to find another job. M.G. eventually offered to buy the business from defendant, but he refused. M.G. left for another job. During trial, defendant and his wife (Jane's stepmother) claimed M.G. demanded ownership of the business in exchange for making these charges go away. M.G. denied making such a statement or demand.

[9] John J., defendant's son's stepbrother, testified his wife called M.G.'s wife, and told her about the allegations that defendant was having sex with Jane. John J. knew that M.G. confronted defendant as a result of those calls.

Shortly after talking to M.G., Betty C. received a call from defendant, who said he told a therapist he had an inappropriate relationship with Jane. Defendant acknowledged that he had done it. Defendant said he wanted Betty C. to know because he did not know what was going to happen. Betty C. asked defendant how long it had been going on. Defendant replied: " 'For a while.' " Betty C. asked defendant if he was the father of Jane's child. Defendant said he was not sure.

The day after she spoke to defendant and the son, Betty C. drove to Chowchilla to speak to defendant. They met in her hotel room. Defendant apologized to Betty C., and said he was "really sick and he was sorry for what was going on. And we cried together."

Betty C. separately visited Jane, who asked if she knew what was going on. Betty C. said yes. Jane said she was going to live with her brother.

**Additional evidence about Jane's mental capacity**

As noted *ante*, Ms. Diaz, Jane's social worker, testified at trial about her mental capacity. Ms. Diaz explained Jane did not understand the concept of money. Jane received $75 per week from Social Security. Defendant and his wife previously supervised Jane's expenses. After Jane left defendant's home, the Central Valley Regional Center became her payee, and Jane's brother and his wife helped her. Jane received a regular allowance for room, board, and expenses. Ms. Diaz helped Jane when she asked for additional spending money.

Ms. Diaz knew Jane when she was pregnant in 2004. Jane made it "very clear" that she did not want to have any more children, and Ms. Diaz did not think she could care for a child independently. At that time, Ms. Diaz suggested that Jane receive Norplant for birth control, since she would not be able to remember to take daily birth control pills.

After the instant case began, Ms. Diaz spoke with Jane about the situation. Jane said she did not share certain information with Ms. Diaz in the past because she was embarrassed.

10.

Detective Clark testified he spoke with Jane during the investigation, and she did not appear to be of normal and average intelligence. However, she did not seem to be easily misled. Betty C., Jane's aunt, testified she was "mostly kind of a one-sentence girl," but she was able to send text messages to her.

M.G. testified that Jane continued to live with his family after he removed her from defendant's house. M.G. knew that Jane had attended special needs classes at Madera High School. He never heard that she was in a particular grade, and he did not think she earned a diploma. He also knew that Jane used to work at a golf course and cleaned restrooms. She obtained the job through a company which helped the mentally disabled learn certain skills, and she earned a small wage.[10]

M.G. testified Jane, who could not drive, was pretty stable in his home, and she could stay as long as she wanted. M.G. and his wife took Jane shopping and to the bank. They helped her select her clothes so they are not too "childish." Jane's clothes had been "[l]ike cartoons … we want her to look a little more appropriate." M.G. was protective of Jane because he did not want her to come into contact with defendant, since they still lived in the same community.

## JANE'S TRIAL TESTIMONY

At trial, Jane testified she was 30 years old. She testified that she understood the difference between the truth and a lie. She knew that it was bad to tell a lie, and she could get into trouble for lying. She promised to tell the truth.

Jane testified she used to live with defendant and her stepmother. They lived in Easton and moved to Chowchilla when she was 20 years old. She had many brothers, sisters, stepbrothers, and stepsisters. Jane testified she went to Madera High, and graduated when she was 22 years old. Her favorite subject was math, and she was good

---

[10] Ms. Diaz confirmed Jane previously had a cleaning job at a golf course.

11.

at it.  She could not remember her math teacher's name.  She testified she could do "times."  She knew that three times three was nine.  She did not know five times six.  Jane testified she moved in with her brother and his family in 2008, but she did not remember when that happened.

When asked if she remembered anything that happened when she lived with defendant, she replied:  "He did something bad to me," and he was "[h]aving sex with me."  She described "having sex" as "[w]hen a girl and a boy, like, love each other."  She knew that sex was "[s]omething you do" with "[a]ll" of their bodies.

**The sexual assault in the bedroom [April 2009; counts V, VI, and VIII]**

Jane testified about an incident that occurred in the bedroom she shared with her stepsister, A., when she lived in defendant's house in Chowchilla.  Jane initially testified this was the first time defendant had sex with her.  As we will explain, however, she ultimately testified this was the last time defendant had sex with her.

The prosecutor asked Jane about the first thing she remembered about when defendant had sex in that bedroom.  Jane testified she was in her bedroom, it was dark, and she was asleep.  Defendant came into her room, and she thought she heard the door squeak.  The prosecutor asked Jane how she knew it was defendant in her room.  She testified she could see his hair.[11]

The prosecutor asked Jane what was the next thing that happened.[12]  She testified defendant "just got in my bed and started doing it with me."  He was wearing shorts.  She felt him get into bed with her.  She felt "[a] boy's thing" on her legs.  The prosecutor

---

[11] On cross-examination, Jane testified she had "a doubt" whether the man was defendant, but also testified she saw defendant's hair, and she was sure defendant was the man.

[12] The prosecutor primarily used leading questions when she asked Jane about defendant having sex with her in her bedroom.

asked Jane if she knew what that part of the body was used for, besides having sex. She did not know.

Jane testified she knew the person was defendant when his body touched her body. Defendant "started doing it with me," and described it as "[w]hen a guy and a girl have sex together" and "[t]hey move up and down." Defendant pulled off her underwear.

Jane testified she was lying on her side, facing the wall, and defendant's body moved up and down on her. She testified defendant's "dick" went into the front of her body.

The prosecutor asked Jane what happened next. She testified: "Then he just made love to me." She did not want it to happen, and she did not say anything. She testified she "pushed him off" with her legs.

Defendant fell to the floor and then got up. Defendant said, "Don't tell nobody." She felt sick to her stomach. A. did not wake up.

Jane testified she told defendant to stop. She "said it loud." Her stepmother came to the bedroom, and Jane told her "everything going on, that my dad had sex with me." Jane believed her stepmother called the police, but Jane was gone when the police came.[13] She testified defendant told her brother, M.G., what happened, and her brother picked her up after work that day.

**The other incidents**

After Jane described the bedroom incident, the prosecutor asked her if something like this happened before:

"Q    Had you told him before that you didn't want to do that?

"A    Yes.

---

[13] Detective Clark testified there was no record of defendant's wife calling the police and reporting the molestation of Jane.

13.

"Q    Had he done this to you before?

"A    I don't think so."

The prosecutor asked Jane to think about whether it happened before, since she said that she told him not to do it.

"Q    Do you remember whether or not this had happened before?

"A    It happened before, but I don't remember it."

The prosecutor asked where it happened, and Jane said it happened twice in A.'s bedroom.  She did not know when it happened.  The prosecutor again asked if she remembered the first time it happened.  Jane said:  "Kind of."

"Q     … What do you remember?

"A    Same thing."

Jane thought the first time happened "[a] long time" before the last time, and it was at night.  She testified she never wanted to have sex with defendant, but she was "not really" afraid of him.

Jane testified she told her stepmother about what happened with defendant.  She also told her stepbrothers.  She told her brother about what happened when he picked her up, but she did not know when that happened.

On cross-examination, defense counsel asked Jane if it happened only twice.  Jane gave inconsistent replies.  She initially said yes.  Defense counsel asked if she remembered the first time and how old she was.  Jane said she did not remember.  Defense counsel asked where it happened.  She testified the first time was when they "lived in the country," maybe in Missouri.  She kicked defendant off her that time.  She also testified she was a "little kid" in Missouri, but nothing bad happened when they lived there.  Jane was sure the last time happened at her brother's house, and she did not know how old she was.  On further questioning, however, Jane testified it never happened after she moved in with her brother.

14.

**Jane's current status**

Jane testified she currently lived with her brother and his family. On that particular morning, she made her own breakfast of cereal and milk. She testified she used the store to cook bacon and eggs, and macaroni and cheese.

She testified she received $75 every week from the government, but she did not know why. Her brother and his wife kept her money for her. If she needed more money, she contacted "Sharon," who was a "friend" from "Kids Services." She wanted to drive, but no one had taught her. Her brother and his wife drove her around. She testified she had a boyfriend, and she wanted to marry him.

## EVIDENCE ABOUT DEFENDANT'S PRIOR SEXUAL ACTS

Pursuant to Evidence Code section 1108, the court permitted the prosecution to introduce the testimony of defendant's other two adult daughters—M.Ga. and M.Gr.— that defendant sexually molested them when they were children. Jane was their sister and M.G. was their brother.

**M.Ga.**

M.Ga. was 27 years old at the time of trial. She used to live in Chowchilla with defendant; her stepmother; her sisters, M.Gr. and Jane; and her stepsiblings.[14]

M.Ga. testified defendant molested her "everywhere" they used to live, including Illinois, Oklahoma, Easton, and Chowchilla. She thought the first time it happened was when he was driving his truck. She wasn't sure about her age. Defendant put his fingers in her private area. Defendant also put his private part in her body on other occasions.

---

[14] Jane's siblings, M.G. and M.Gr., described M.Ga. as their sister rather than their stepsister. However, M.Ga. testified defendant was not her "biological" father. Defendant testified his name was on M.Ga.'s birth certificate, but someone else was her father.

She testified there were incidents when defendant entered her bedroom and put his fingers in her private area while she slept.

M.Ga. testified defendant did these things to her the "whole time" she lived with him and "whenever he felt like it." It probably happened every day, but she was not certain how many times it happened.

She testified no one believed her when she tried to tell. When she was seven or eight years old, she reported defendant's conduct to the police in Chowchilla. The police came to their house, but they told her she didn't have any proof. Defendant later told her that if she told anyone what happened, he would beat her "black and blue … until I bled."

M.Ga. testified that when she was 15 years old, she ran away from defendant's home "because I couldn't handle being treated this way anymore." She left with her sister, M.Gr., because M.Gr. "didn't want to see us like this." They moved in with their mother in Stockton. They wanted to take Jane with them, but defendant "had [Jane] so scared that … she won't say nothing to no one,… [H]e threatened [Jane] before, telling [her] that she better not leave or anything. So [Jane] wouldn't leave."

**M.Gr.**

M.Gr., Jane's other sister, was 27 years old at the time of trial, and repeatedly stated that she did not want to testify. She had been taken into custody on a bench warrant for failing to appear.

The prosecutor asked M.Gr. if she told Detective Clark that defendant molested her when she was little. She responded: "Damn you, Dad. [¶] I don't want to do this. I don't want to do this." She added: "Dad, why couldn't we just have been normal? Why couldn't we just been a normal family?"

M.Gr. admitted that she told Detective Clark that defendant molested her. The prosecutor again asked if defendant molested her. She replied: "What does it matter anymore? Nobody cared when I tried to say something, so why all of a sudden 20 more years down the line does anybody care?" The prosecutor asked her if she had forgiven

16.

her father for what he did to her when she was little.  She said yes, and explained:  "You got to forgive to forget…."

M.Gr. did not remember telling Detective Clark about an incident that occurred when she was 14 years old, she stayed home from school because she was sick, defendant played a pornographic movie and threatened her with a belt, and he molested her.  She said Detective Clark was lying about that story.  However, she testified she saw "porn," but defendant "didn't start nothing again."  She said she would have been afraid of "the shame" and not the belt.

M.Gr. testified she was 14 years old when she left defendant's home and moved in with her mother in Stockton.  "If I could have got [Jane] I would have got [her], but I couldn't get [her].  [¶] … [¶]  They don't let her out of their sight.  She's on lockdown out there."

"Q.  Why did you want to take her?

"A.  What are we sitting here today for?  To prevent all this."

The prosecutor asked M.Gr. for her age when defendant first molested her.  She replied:  "I hate you, Dad.  I hate you, Dad.  I hate you."  She testified she was little, she did not know how old she was, and she told him to stop.

On further questioning, M.Gr. testified the family lived in Illinois when she was six or seven years old.  During that time, defendant took her and her stepsister from their bedroom to watch pornography on television.  She did not remember anything that happened after that, and blocked it out of her mind.

M.Gr. had recently been working for defendant's diesel mechanic business.  Her children would take the school bus to the business, and then she would take them home.  She denied that defendant was around her children.

17.

**M.Gr.'s prior statements**

Detective Clark testified he interviewed M.Gr. in May 2009, and she disclosed an incident which occurred when the family lived in Chowchilla. She said she stayed home from school because she was ill. Defendant played pornography on television and called her into the room. Defendant was sitting on the couch and a belt was next to him. She knew that if she did not do what defendant wanted, he would beat her with the belt like he had done on prior occasions when she refused. She said she went to defendant, and he removed her clothes. He placed his fingers in her vagina for 5 to 10 minutes. She finally got the courage to grab her clothes and run away. She said the day after the incident, she got her sister, M.Ga., and they ran away from Chowchilla. They went to Stockton and lived with their mother.

Detective Clark testified M.Gr. said defendant had "full intercourse" with her when she was between five and seven years old, when the family lived in Illinois, and it was very painful.

## DEFENSE EVIDENCE

While defendant had confessed to Dr. Streeter, his defense theory was that she misunderstood what he told her, and he never touched Jane or his other daughters.

James W., defendant's stepson, was 22 years old and worked in defendant's mechanic shop. James was living at defendant's house in Chowchilla with Jane in April 2009. James explained he could hear conversations between family members throughout the house and in the other bedrooms. Jane never said defendant touched or had sex with her. He never saw or heard anything which made him think defendant did something sexual with her. James described Jane as "[c]hild-like," and her mental capacity was not the same as an average person her age.

Christopher W., another of defendant's stepsons, was 24 years old. Christopher also explained defendant's house was small and everyone could hear conversations in other rooms. Jane never told him that defendant touched her in an inappropriate way, and

18.

nothing happened that made him think defendant did something to her. Christopher used to help her with her homework, and he testified that she could comprehend, but she would forget within minutes.

Christopher confirmed that he spoke with Detective Clark, and told him that his mother called him on April 24, 2009, and she was crying. She said the police had picked up defendant, and she was "freaking out." Christopher went home, and his mother said the police took defendant. Christopher called his brother, John, and told him that their mother was "freaking out." Christopher asked John if he knew what was going on. John said he did not know.

Christopher testified his mother never said defendant was a "sick f**k." He never used that term with John, and he never made those statements to Detective Clark.

**Jane's stepmother**

Defendant's wife (Jane's stepmother) had been married to defendant for 19 years. She testified Jane acted like someone who was 12 or 13 years old.

The stepmother testified she never caught defendant doing anything of a sexual nature with Jane, either before or in April 2009. She denied that she told a deputy that she caught defendant doing something with Jane, or that she saw defendant leaving Jane's bedroom. She explained she was vigilant about such conduct because she was a rape survivor herself.

The stepmother testified something happened the night before defendant was arrested. She was sleeping on the couch when she heard a "thunk." She went to check the sound, and found Jane "bumping" out of the bathroom. Jane "had a big smile on her face like she hit the wall, bounced on it, and she was laughing, and going to the bathroom…." The stepmother admitted she said, " 'That wasn't right,' " but she meant the sound that she had heard was not right. She did not see defendant near Jane or her bedroom.

19.

The stepmother talked to Jane the next day, and asked about the noise. Jane said, " 'We were talking.' " The stepmother thought Jane meant she was talking to A., Jane's stepsister who shared the bedroom.

The stepmother further testified she did not talk to an officer when defendant was arrested. She called her son, Christopher, but she never said defendant was sick. She spoke to an officer several weeks later. She might have told an officer that she said, " 'That ain't right,' " but she was referring to the sound she heard from the bedroom.

The stepmother testified that several months after defendant was arrested, M.G. told defendant he wanted 50 percent of the business. M.G. said things would get better, and this whole case " 'could just go away,' " if defendant gave him the business.

**Defendant's testimony**

Defendant testified that when the family lived in Easton, his children were taken from him by Child Protective Services. He never found out the reason, but he "heard" there were allegations that "someone had been raped." He later learned that M.Gr. told a teacher that she was being beaten, and her brother was involved.

Defendant testified he never touched any of his children inappropriately. He never played pornography on television. M.Ga. and M.Gr. were lying and he never had sex with them.

Defendant testified he raised Jane since her birth. When she was a toddler, she drank a bottle of heart medication; it slowed her heart rate; she became very ill; and she suffered a lack of oxygen. After she recovered, she was not normal and had special needs in school. Defendant did not think Jane could live on her own because she needed supervision.

Defendant testified he never touched Jane in a sexual way at any time. Defendant admitted he went into Jane's bedroom one night because he heard some noise. He discovered Jane was "clunking up" against the wall. Jane woke up. He told her to stop

20.

making noise, and he left the room. His wife later asked him what happened, and he explained to her that he heard a noise. Defendant told this to the police.

Defendant admitted he met with Dr. Streeter in April 2009, the day after going into Jane's bedroom. He had been planning to do so because one of his stepdaughters was going through a difficult divorce, and he wanted to talk to someone about her problems.

Defendant testified that during this conversation, he never used the word "sex," but Dr. Streeter kept using the phrase "inappropriate behavior" and "throwing [it] towards me." Defendant testified Dr. Streeter asked about the father of his step-grandchildren. As they talked about his stepdaughter, defendant mentioned he did not know the identity of the father of Jane's child. Defendant never told Dr. Streeter he might be the father of Jane's child. Defendant testified Dr. Streeter misunderstood what he was talking about, and he might not have understood all of Dr. Streeter's questions since he was deaf in one ear.

Defendant testified he never told his son, M.G., that he touched Jane. After he was arrested, M.G. said he could "make it all go away" if defendant gave him half the business. If defendant refused, M.G. said he "would see me rot in prison."

Defendant testified he never told his sister, Betty C., that he had sex with Jane; he never met with Betty C. in a hotel room; and he never talked with Betty C. about whether he was the father of Jane's child. Defendant testified there was tension in his relationship with Betty C. because of the division of his parent's estate.

Defendant admitted he called Betty C. when the allegations were made against him. He told Betty C. that his son "was up to it again," because his son was trying to take his business away from him. Defendant also admitted that Betty C. drove to Chowchilla after he was arrested, but she only wanted to talk about putting their father in a nursing home. Defendant insisted he never talked to Betty C. about the allegations, and he did not know why she would lie about that.

21.

## REBUTTAL

In rebuttal, the prosecution called Deputy Rodriguez, who testified about his initial interview with the stepmother on April 24, 2009, as summarized above.

Detective Clark testified he interviewed defendant's wife later in the investigation and asked what happened in Jane's bedroom. She said she was asleep on the couch when she heard a noise. When she went to check on it, she saw Jane run out of her bedroom and go into the bathroom. Shortly afterwards, defendant left the bedroom. Defendant's wife said she told defendant that whatever he was doing was wrong.

Detective Clark testified he asked defendant's wife what she thought was going on. She said she "had a gut feeling, but that she didn't know and she didn't see anything."

Detective Clark testified he also interviewed Christopher, defendant's stepson, about his conversations with defendant's wife after the incident in Jane's bedroom. Christopher said that defendant's wife called him around 6:00 a.m., and said she caught defendant in the room with Jane. She called defendant "a sick motherf**ker."

## PROCEDURAL HISTORY

### The charges

The information alleged defendant committed four felony offenses against Jane, on or about and between January 1, 2004, and January 1, 2005, based on defendant's statements to Dr. Streeter that Jane was pregnant in 2004, and he might have been the father of her child. While defendant was found not to be that child's father, the prosecution argued that defendant's statements to Dr. Streeter indicated that he was having sex with her when she became pregnant in 2004. These charges consisted of count I, rape by force or fear; count II, sexual intercourse with a person incapable of giving legal consent because of a mental disorder and a developmental and physical disability; count III, sexual penetration of a person incapable of giving legal consent

22.

because of a mental disorder and a developmental and physical disability; and count IV, incest.

Defendant was also charged with committing the following offenses against Jane, on or about and between April 12 and April 25, 2009, based on defendant's statements to Dr. Streeter on April 24, 2009, that he had sex with Jane the previous night; the stepmother's observations of defendant leaving Jane's bedroom, which occurred the night before he went to Dr. Streeter; and Jane's description of defendant's conduct: count V, rape by force or fear; count VI, rape of a person incapable of giving legal consent because of a mental disorder or a developmental and physical disability; count VII, sexual penetration of a person incapable of giving legal consent because of a mental disorder and a developmental and physical disability; and count VIII, incest.

**Defendant's motion to dismiss**

After the prosecution rested, defendant moved for dismissal and argued there was no evidence that Jane was incapable of giving legal consent because of a developmental disability. Defendant argued that expert testimony was required to resolve the issue. The prosecutor replied that expert testimony was not required and Ms. Diaz's testimony provided substantial evidence to prove Jane's lack of capacity to consent.

The court denied defendant's motion and found Jane's ability to consent was a factual question for the jury, and Ms. Diaz and other family members provided ample evidence on the issue, particularly about Jane's inability to function on her own.

**Verdict and sentence**

After both parties rested, the court granted the prosecution's motion to dismiss counts III and VII, sexual penetration based on the alleged 2004 and 2009 incidents.

The jury found defendant guilty of three counts based on the April 2009 incident: count V, rape by force or fear; count VI, rape of a person incapable of giving legal consent because of a mental disorder or a developmental and physical disability; and

23.

count VIII, incest (§ 285). The jury was deadlocked on counts I, II, and IV, based on the 2004 incident, and the court declared a mistrial.

Defendant was sentenced to the maximum term of eight years in prison.

The prosecutor subsequently advised the court that she intended to retry defendant on the three deadlocked counts based on the 2004 sexual assaults. In addition, the prosecutor filed an amended information (case No. MCR042741) based on "a brand new case alleging brand new violations." However, the instant record is silent as to the nature of those charges.

## DISCUSSION

### I. Substantial evidence of Jane's lack of capacity to consent

In count VI, defendant was charged and convicted of violating section 261, subdivision (a)(1), rape of a person incapable of giving legal consent because of a mental disorder or a developmental and physical disability, committed on or about and between April 12 and April 25, 2009. Defendant contends this conviction must be reversed because there is insufficient evidence Jane lacked legal capacity to consent to sexual intercourse. Defendant asserts there was actually substantial evidence that Jane understood the nature and meaning of sexual relations, and had the capacity to consent, because she was pregnant in 2004; she told Ms. Diaz that she did not want to get pregnant again; and she was able to graphically describe what defendant did to her when he got into her bed.

As we will explain, Jane's legal capacity raised a question of fact for the jury, Jane's obvious impairments are virtually identical to those found sufficient in other cases to establish her lack of capacity, and the jury's implicit findings on this point are supported by substantial evidence.

### A. Substantial evidence

When a criminal conviction is challenged as lacking evidentiary support, "... the court must review the whole record in the light most favorable to the judgment below to

24.

determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*Ibid.*) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### B. Section 261, subdivision (a)(1)

Defendant was charged and convicted of violating section 261, subdivision (a)(1), which states:

> "(a) Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances:

> "(1) Where a person is incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act. Notwithstanding the existence of a conservatorship pursuant to the provisions of the Lanterman-Petris-Short Act (Part 1 (commencing with Section 5000) of Division 5 of the Welfare and Institutions Code), the prosecuting attorney shall prove, as an element of the crime, that *a mental disorder or developmental or physical disability rendered the alleged victim incapable of giving consent*." (Italics added.)

"It is a felony to have sex – including intercourse, oral sex, sodomy and digital penetration – with a person who is so developmentally disabled as to be 'incapable ... of giving legal consent,' provided 'this is known or reasonably should be known to the person committing the act.' [Citations.] This is true even if the victim purports to consent. [Citations.] Obviously, it is the proper business of the state to stop sexual predators from taking advantage of developmentally disabled people. Less obviously, however, in doing so, *the state has restricted the ability of developmentally disabled*

25.

*people to have consensual sex.*" (*People v. Thompson* (2006) 142 Cal.App.4th 1426, 1429, italics added, (*Thompson*).)

"The principle that rape may be committed by having sex with a person so mentally incapacitated as to be incapable of consenting is hardly novel. 'Under English common law this situation was considered no different from intercourse with an unconscious person....' [Citation.] In California law, the phrase 'incapable ... of giving legal consent' dates back at least as far as the original Penal Code of 1872,…" (*Thompson*, *supra*, 142 Cal.App.4th at p. 1434.)

"In the context of rape and other sexual assaults, 'consent' is defined as the 'positive cooperation in act or attitude pursuant to an exercise of free will.' [Citation.] To give consent, a 'person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved.' [Citations.] In short, that definition describes consent that is actually and freely given without any misapprehension of material fact…." (*People v. Giardino* (2000) 82 Cal.App.4th 454, 459-460.)

"By itself, the existence of actual consent is not sufficient to establish a defense to a charge of rape. That the supposed victim actually consented to sexual intercourse disproves rape only if he or she had 'sufficient capacity' to give that consent. [Citations.] *For example, if the victim is so unsound of mind that he or she is incapable of giving legal consent, the fact that he or she may have given actual consent does not prevent a conviction of rape.* [Citations.]" (*People v. Giardino*, *supra*, 82 Cal.App.4th at p. 460, italics added.)

Thus, "legal consent presupposes an intelligence capable of understanding the act, its nature, and possible consequences…." (*People v. Griffin* (1897) 117 Cal. 583, 585, overruled on others grounds by *People v. Hernandez* (1964) 61 Cal.2d 529, 536; *People v. Lewis* (1977) 75 Cal.App.3d 513, 519.) If a defendant is charged with raping a victim who lacked the capacity to give legal consent, "then actual consent is irrelevant …." (*People v. Giardino*, *supra*, 82 Cal.App.4th at p. 461.)

26.

## C. Capacity to consent

In his motion for dismissal, defendant argued the prosecution had failed to present any expert testimony about whether Jane had the legal capacity to consent; he renewed this assertion in closing argument. While defendant's argument ignored Ms. Diaz's testimony as an expert about Jane's limitations, his contentions were also based on the erroneous supposition that expert testimony was required to prove Jane's lack of legal capacity.

"The existence of capacity to consent is a question of fact. [Citations.]" (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1413 (*Miranda*).) In addition, "[t]here is a nationwide consensus that expert testimony on this issue is not required. [Citations.]" (*Thompson*, *supra*, 142 Cal.App.4th at p. 1437.) While expert testimony may be admitted on this issue, "[a] lay juror is able to assess the extent of a victim's mental disability…." (*Miranda*, *supra*, 199 Cal.App.4th at p. 1413; *Thompson*, *supra*, 142 Cal.App.4th at pp. 1437, 1439.

The lack of capacity to consent "does not call for any particular type of clinical diagnosis…." (*People v. Lewis*, *supra*, 75 Cal.App.3d at p. 19.) The court does not have a sua sponte duty to instruct the jury on the "technical legal or medical diagnosis of developmental disability." (*People v. Mobley* (1999) 72 Cal.App.4th 761, 783 (*Mobley*), disapproved on other grounds in *People v. Trujillo* (2006) 40 Cal.4th 165, 181, fn. 3.) The prosecution is not required to introduce evidence of "a technical diagnosis of developmental disability as medically defined" in order to support a conviction. (*Mobley*, *supra*, 72 Cal.App.4th at p. 789.) "To the extent such definition may help the jury in any particular case, it is more properly a pinpoint instruction which requires a request. [Citation.]" (*Id*. at p. 788.)

" 'The question whether a person possesses sufficient resources – intellectual, emotional, social, psychological – to determine whether to participate in sexual contact with another is an assessment within the ken of the average juror, who likely has made

27.

the same determination at some point.' [Citation.]" (*Thompson*, *supra*, 142 Cal.App.4th at p. 1439.) "The jury's determination of Jane's capacity to consent necessarily depend[s] upon the jurors' subjective assessment of her demeanor, as her demeanor as a witness [is] highly probative of her mental condition. The demeanor of witnesses is rarely reflected in the record. [Citation.] 'As a reviewing court, we confront a cold record without the trial court's benefit of observing firsthand the appearance and demeanor of the witness.' [Citation.]" (*Miranda*, *supra*, 199 Cal.App.4th at p. 1414.) A jury's implicit determination of the credibility of a victim must be given proper deference on appeal. (*Ibid.*)

### D. Examples of lack of capacity

A series of cases have considered whether there is substantial evidence to support the jury's implicit finding that the victim lacked legal capacity to consent to sexual conduct because of the victim's mental defect or developmental disability. These cases have relied on evidence provided by both expert and lay witnesses, and describe victims with impairments very similar to Jane's condition.

In *People v. Boggs* (1930) 107 Cal.App. 492, there was evidence the victim was "of subnormal mentality." (*Id.* at p. 493.) Expert witnesses testified the victim had the mind of a 10 or 12 year old child. She could do housework and cook. She attended high school but one of her teachers testified that she had to repeat his class, and he gave her the minimum passing grade to let her go on, even though she did not earn it. (*Id.* at p. 493.) One expert testified that the victim did not have " 'sufficient mentality to protect herself from the ordinary vicissitudes of life.' " (*Id.* at p. 494.) The victim testified at trial and showed "considerable intelligence in fixing dates and describing places and events," and she understood what sexual intercourse was and that it could result in pregnancy. (*Ibid.*) As the court explained, however, her understanding "was essentially that of a child," and she did not understand that sexual intercourse could have "other

serious consequences." (*Ibid*.) *Boggs* concluded such facts provided substantial evidence the victim was incapable of giving legal consent. (*Id*. at p. 496.)

In *Mobley*, the defendant was convicted of sodomizing two young men who lacked legal capacity to consent. (*Mobley*, *supra*, 72 Cal.App.4th at p. 768.) Both victims were in their early 20s. The evidence about the victims' abilities, impairments, and limitations was introduced through the testimony of their mothers, family members, and friends. Both victims were developmentally delayed with low IQs, but they were not "technically mentally retarded." (*Id*. at p. 778.) They could read, dress themselves but had difficulty understanding what was appropriate to wear, hold down parttime jobs, handle money and make purchases, vote, use a microwave, and use public transportation. One victim had an IQ of 80 and the ability to reason of less than a 14 year old. He had attended high school and received a certificate of completion. He had taken sex education classes and knew about heterosexual sex. (*Id*. at pp. 770-772, 774, 776-779.) The other victim's IQ was 75 and equivalent to the mental age of an 11 year old. He had been in special education classes. He had had some sex education in school. (*Id*. at pp. 779-780.) Both victims testified and described the sexual acts committed by defendant in some detail, using descriptive anatomical terms, and further testified they did not like what the defendant did to them. (*Id*. at pp. 775-776.)

*Mobley* found there was substantial evidence the victims lacked the capacity to give legal consent, based on the evidence provided by their families about their impairments. (*Mobley*, *supra*, 72 Cal.App.4th at pp. 789-790.) An expert witness also testified "as to the things the jury must find for either young man to understand and give 'consent' rather than 'assent' for the acts. He found both men to be 'developmentally delayed' to the point that they would have difficulty applying what they learned and in making choices because of their disabilities...." (*Id.* at p. 789.) "More importantly, the jury heard the full testimonies of [the two victims]," and the jury "could have reasonably

29.

inferred" from their direct testimonies that they "did not have the capacity to give legal consent" at the time the sexual acts were committed. (*Id*. at pp. 789-790.)

In *Thompson,* the defendant was convicted of committing multiple sexual acts against a victim who lacked the legal capacity to consent. The victim was born with Down syndrome and was 34 years old, with an effective intellectual age between 7 and 10 years old. The defendant worked at the group home where the victim lived, and sexually assaulted her. (*Thompson, supra,* 142 Cal.App.4th at pp. 1430-1431, 1436.)

*Thompson* reviewed the extensive evidence about the victim's abilities and impairments, and held there was substantial evidence that she lacked capacity to legally consent. The victim went to special education classes and attended high school. She received a certificate of completion instead of a diploma. (*Thompson*, *supra*, 142 Cal.App.4th at pp. 1431, 1436.) The victim worked in sheltered workshops for the developmentally disabled and performed tasks such as stuffing envelopes, painting ceramics, hanging up clothes, and sorting books; she was paid less than minimum wage. She also received disability benefits. (*Id*. at p. 1431.) She could add, but she had trouble subtracting and could not divide. She could not make change or carry out banking transactions without help. She did not understand the concept of a credit card. (*Id*. at pp. 1431-1432.) The victim could not cook a meal: "If she was left in the kitchen unsupervised for more than 15 minutes, there was a risk that 'the kitchen might burn down.' " (*Id*. at p. 1432.) She had to be reminded to perform basic acts of personal hygiene and dressing. She voted by copying her mother's ballot. (*Ibid*.)

*Thompson* acknowledged there was evidence the victim had a limited understanding of the nature and consequences of sexual intercourse. (*Thompson*, *supra*, 142 Cal.App.4th at pp. 1436-1437.) The victim had a boyfriend in the group home, and they engaged in intimate relations, but her mother had given permission and consented to their relationship. (*Id*. at p. 1433.) The morning after the defendant sexually assaulted the victim, she called her mother and said the defendant " 'raped' " and " 'molested' "

her. (*Id*. at p. 1430.) The victim offered similar descriptions when she testified at trial. She defined "rape" as " '[w]hen a man wants to have sex' but she 'wasn't ready to have sex' with him." (*Id*. at p. 1432.) She knew that someone could get pregnant by having sex, but did not know that someone could get a disease from having sex. (*Ibid*.)

*Thompson* reviewed the facts in *Mobley*, *supra*, 72 Cal.App.4th 761 and *Boggs*, *supra*, 107 Cal.App. 492, and similarly concluded there was substantial evidence the victim was incapable of giving legal consent based on her impairments. (*Thompson*, *supra*, 142 Cal.App.4th at pp. 1436-1437.) The victim's relationship with her boyfriend did not mean that she had the legal capacity to consent. The relationship was approved by her mother, and it did not involve the same type of sexual acts committed by the defendant. (*Id*. at pp. 1436-1437.) While the victim understood the concepts of rape and sexual intercourse, and that sexual intercourse could lead to pregnancy, that understanding was deemed on the same level as a "children's rhyme." (*Id*. at p. 1436.) "The fact that she knew what consent (or lack of consent) was, however, did not conclusively prove that she was able to give it." (*Id*. at p. 1437; see also *Miranda*, *supra*, 199 Cal.App.4th at pp. 1414, 1417.)

### E. <u>Analysis</u>

Defendant contends his conviction must be reversed because the evidence about Jane's limitations did not address the question of whether Jane had the legal capacity to consent. However, there is overwhelming evidence to support defendant's conviction in count VI, and that Jane lacked the legal capacity to consent, based on the testimony of both the prosecution and defense witnesses.

Jane's legal capacity to consent raised a question of fact for the jury, and the prosecution was not required to introduce expert testimony on the point. Indeed, the record demonstrates that, based on the testimony of her family and her own trial appearance, Jane's impairments are extremely similar to the impairments suffered by the

31.

victims in *Mobley*, *supra*, 72 Cal.App.4th 761 and *Thompson*, *supra*, 142 Cal.App.4th 1426.

Defendant complains about the lack of expert testimony, but Ms. Diaz, the social worker, had regular contact with Jane and extensively testified about her impairments. Jane's overall IQ was 61, which placed her "at the mild/moderate stage of developmental delays," and it was "pretty clear for most folks that her capacity is definitely in question." Jane had always lived with someone and needed supervision. She had difficulty signing her name and her reading skills were very limited. While Jane had graduated from high school, she received a diploma through the special education program, and it was based on different requirements than a regular diploma. She did not have to satisfy the same testing levels "to graduate as a normal, functioning adult would."

Ms. Diaz testified that Jane did not have the ability or capacity to live or take care of herself independently. She could not care for her personal hygiene without being reminded to do so, and she did not understand the consequences of certain things, such as how a fire could start from leaving on a burner. She would not be able to grasp the rules of the road or pass a driver's test. She could not manage the financial aspects of living alone. She was unable to make change, and she did not have a realistic idea of what things cost. Jane received a weekly disability benefit, but someone always had to manage her financial affairs for her. She previously had a job cleaning restrooms at a golf course, through a company which helped the mentally disabled.

Detective Clark testified that Jane did not appear to be of normal and average intelligence. Even defendant and his wife agreed with the prosecution witnesses about Jane's impairments. When a deputy initially interviewed the defendant's wife about the sexual abuse allegations, she said Jane had the mindset of a 12-year-old. At trial, defendant's wife testified that Jane acted like someone who was 12 or 13 years old. Christopher, defendant's stepson, testified he used to help Jane with her homework, but

she would forget the concepts within minutes. James, another stepson, described Jane as "[c]hild-like," and her mental capacity was not the same as an average person her age.

Defendant told Dr. Streeter that Jane's functional age was equal to a 16 or 17 year old. At trial, even defendant testified Jane was not normal – she had special needs, and she could not live on her own because she needed supervision.

Defendant argues there was "substantial specific evidence" that Jane had legal capacity, sexual experience and understanding, based on her 2004 pregnancy. Defendant asserts the pregnancy demonstrated Jane "understood the sexual act, had knowledge about the consequences of sex and did not want [defendant] to proceed with sex when, in 2009, he got into her bed .…" Defendant further argues the evidence only shows Jane had "a negative opinion about sex with her father … and had kicked her father out of bed .…" Defendant asserts that to find his conviction is supported by substantial evidence "would be tantamount to ruling that all or nearly all developmentally disabled or mentally retarded persons are incapable of consenting to sex[,]" contrary to federal and state constitutional protections for mentally impair persons to bear children.

These arguments are meritless. The instant case is not about whether Jane had the constitutional right to bear children or engage in an intimate relationship with a man, with full knowledge, awareness and understanding of the nature of a sexual relationship and the ability to legally consent. Instead, the record demonstrates the defendant had a sexual relationship for nearly 10 years with his daughter which, by his own admission, began while she was a minor, and with full knowledge of her developmental disabilities, that she could not take care of herself, and her mental facilities were that of a child.

As for Jane's pregnancy, Dr. Streeter testified that defendant suspected he was the father of the child. During the investigation into this case, however, defendant was ruled out as the father of Jane's child. There was no other evidence as to the child's paternity, aside from defendant's self-serving statements to his sister in 2004 that he suspected the father was someone with the same type of developmental disabilities who took advantage

33.

of Jane. At the time defendant made these statements, however, he suspected that he might be the father of Jane's child, thus indicating he was having sex with Jane in 2004.

In contrast to *Thompson*, *supra*, 142 Cal.App.4th 1426, there is no evidence that Jane had a consensual sexual relationship which led to her pregnancy; indeed, another man may have "taken advantage of her," as defendant was apparently doing at the same time. As explained in *Thompson*, Jane's sexual relationship with someone else, and her understanding that she could get pregnant again, did not mean that she had the legal capacity to consent. Ms. Diaz testified that when Jane was pregnant in 2004, she made it "very clear" that she did not want to have any more children. However, Ms. Diaz testified Jane would not know how to take daily birth control pills. In addition, her ability to describe how defendant sexually assaulted her did not mean that she had the legal capacity to consent to such conduct. Even if she knew the nature of the sexual acts that defendant committed against her, that knowledge did not similarly mean she was able to give consent. (*Id.* at pp. 1436-1437.)

Finally, Jane testified at trial, as did the victims in *Mobley*, *supra*, 72 Cal.App.4th 761 and *Thompson*, *supra*, 142 Cal.App.4th 1426. The jury was able to see and hear her, and assess her nature, demeanor, and mental capacity. While she could verbally express herself, her verbalizations were not consistent with the reality of her developmental limitations. Jane asserted that she could cook for herself, but her brother and Ms. Diaz testified she was not able to do so. She asserted she could do the "times" tables, but she was unable to do so. She knew she received a check every week, but she did not know why. She wanted to learn to drive, but Ms. Diaz testified she could not learn the rules of the road. Jane asserted defendant sexually assaulted her when she lived with her brother, but her brother removed her from the house at the time defendant was arrested.

The entirety of the record supports the jury's implied finding that Jane lacked legal capacity to consent because of her developmental disability.

## II. **The presentence report fee**

At the sentencing hearing, the court ordered defendant to pay a felony presentence report fee of $750 pursuant to section 1203.1b, as recommended in the probation report. Defendant did not object. Defendant now contends this fee must be stricken because the court failed to conduct a hearing or determine his ability to pay the fee, as required by the statute, and there is insufficient evidence of his ability to pay in the appellate record.

Defendant acknowledges he did not object to the imposition of this fee, but contends this court may address the issue because an objection is not required to preserve an appellate claim of insufficient evidence. Defendant's argument is based on *People v. Pacheco* (2010) 187 Cal.App.4th 1392 (*Pacheco*), which held that a defendant could raise an appellate challenge to the sufficiency of the evidence supporting a finding of ability to pay a booking fee, even if he failed to challenge the ruling before the sentencing court. (*Id.* at p. 1397.) However, *Pacheco* has been repeatedly rejected by numerous courts, which have required an objection to preserve fine and fee issues on appeal. (See e.g., *People v. Nelson* (2011) 51 Cal.4th 198, 227 [defendant forfeited his challenge to victim restitution fine by failing to object at his sentencing hearing]; *People v. Crittle* (2007) 154 Cal.App.4th 368, 371 [defendant who did not raise issue of ability to pay crime prevention fee in trial court cannot raise issue on appeal]; *People v. Valtakis* (2003) 105 Cal.App.4th 1066, 1072 [failure to object in trial court to statutory error in the imposition of a probation fee under section 1203.1b waives the matter for purposes of appeal]; *People v. Hodges* (1999) 70 Cal.App.4th 1348, 1357 [appellate review of booking fee waived for failure to raise issue at time of sentencing].)

As noted by the People, a case regarding the continued validity of *Pacheco, supra*, 187 Cal.App.4th 1392 was pending before the California Supreme Court when the instant matter was being briefed. It has now been decided. *In People v. McCullough* (2013) 56 Cal.4th 589 (*McCullough*), the court expressly disapproved *Pacheco* as to the imposition of a booking fee, and held a defendant "who fails to contest the booking fee when the

35.

court imposes it forfeits the right to challenge it on appeal." (*McCullough*, *supra,* at p. 591.) "Given that imposition of a fee is of much less moment than imposition of sentence, and that the goals advanced by judicial forfeiture apply equally here, we see no reason to conclude that the rule permitting challenges made to the sufficiency of the evidence to support a judgment for the first time on appeal 'should apply to a finding of' ability to pay a booking fee .…" (*Id.* at p. 599, fn. omitted.)

The California Supreme Court's reasoning applies equally to the presentence report fee imposed in this case. Defendant was notified in the probation report about the recommendation for the presentencing report fee. His failure to object or challenge the court's imposition of that fee forfeits his ability to challenge that fee on appeal. (*McCullough*, *supra*, 56 Cal.4th at p. 597.)

## III.     The court's no-visitation order

Defendant raises another challenge to the court's orders at the sentencing hearing. The court adopted the probation report's recommendation and ordered no visitation between defendant and "the victim child" pursuant to section 1202.05. Defendant did not object. On appeal, defendant contends this order was legally unauthorized since section 1202.05 only permits the court to impose no-visitation orders when the victim is a minor, and defense counsel was ineffective for failing to object to it.

The People concede the court's no visitation order was unauthorized as a matter of law and counsel's failure to object was prejudicial. Section 1202.05, subdivision (a) provides in relevant part: "Whenever a person is sentenced to the state prison … for violating Section 261 …, and the victim of one or more of those offenses *is a child under the age of 18 years*, the court shall prohibit all visitation between the defendant and the child victim." (Italics added.)

While Jane may have had mental state of a child, she was 27 years old when defendant sexually molested her in 2009, and she was 30 years old when he was

36.

convicted and sentenced to prison. The court erroneously relied on section 1202.05 to issue a no-visitation order in this case.

The People have requested this court order the no-visitation order stricken. We will do so, but the circumstances of this case require additional comment. As discussed, *ante*, defendant was arrested on or about April 24, 2009, after Dr. Streeter reported his confession to the sheriff's department. However, he posted bail and remained out of custody for the nearly two and one-half years before his jury trial began in November 2011. He was convicted on December 16, 2011, and remanded into custody.

At trial, Jane's brother, M.G., testified that he was protective of Jane during the numerous pretrial delays because he did not want her to come into contact with defendant, since they still lived in the same small community. Also at trial, defendant denied that he touched Jane or his other daughters, and denied that he confessed to Dr. Streeter, his son, or Betty C. Defendant's wife and stepson also denied making the inculpatory statements attributed to them by law enforcement and other family members.

At the sentencing hearing, the court heard statements from Jane and her family about their concerns regarding defendant's recantation and his possible contact with Jane. The victim-advocate read a statement on Jane's behalf, that defendant destroyed her life. Jane did not want to leave her brother's house during the pretrial continuances because she was afraid of defendant and her stepmother. Victim services helped her get a restraining order against defendant, and she was doing better since defendant was back in jail.

The court also heard statements from M.G., his wife, and his wife's sister, about the impact of defendant's conduct on Jane's life, and how their own lives suddenly changed when they had to take care of Jane. M.G. and his wife were afraid of running into defendant and his wife during the numerous postponements since they live in a very small town. M.G. believed defendant was "desperate to get away" with his crimes, and

37.

bragged about how he was going to get away with what he did to Jane. Jane was afraid of him, and M.G. was not sure what defendant might do.

While the court lacked statutory authority to impose the no-visitation order, the court's underlying intent and concerns were supported by overwhelming evidence, particularly given the indication that Jane's caretaking family obtained a restraining order against defendant. Indeed, the court found the offenses defendant committed against Jane involved "a very egregious … series of circumstances, having profound impacts on a variety of families, a variety of lives."

It would thus seem appropriate to remand the matter for the court to determine whether it could craft a legally appropriate no-visitation order, or determine what type of restraining order was issued and whether it expired once defendant was remanded into custody. In remanding the matter, we acknowledge the court's ability to issue any type of no-visitation, no-contact, or restraining order is statutorily limited since defendant was sentenced to prison and he was convicted of sexually molesting someone who was an adult, even though she was developmentally disabled. (See, e.g., *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1478; *People v. Stone* (2004) 123 Cal.App.4th 153, 158-161; *People v. Scott* (2012) 203 Cal.App.4th 1303, 1324-1326.)

While defendant remains in prison, "all he can do by way of 'contact' is send [Jane] letters and, perhaps, attempt to call her on the telephone. She of course will be free to throw mail away unread, or to hang up. It also appears that correctional authorities reserve the power to block at least some attempts by inmates to communicate with outsiders, generally upon the latters' request. [Citations.]" (*People v. Scott*, *supra*, 203 Cal.App.4th at p. 1326.)

We do not believe that remand will be an idle act, but it is appropriate under the special circumstances of this case, particularly given her caregivers' continuing concerns about defendant's possible contacts with her after his conviction. If the court determines

that it lacks authority to impose a no contact or no visitation order while defendant is in prison, it should direct the district attorney to advise Jane and her caregivers accordingly.

## **DISPOSITION**

The court's no-visitation order pursuant to section 1202.05 is stricken. The matter is remanded for further proceedings as to whether any type of no-contact or no-visitation order is appropriate, and for the court to advise the relevant parties, particularly Jane and her caregivers, that the original no visitation order has been stricken.

In all other respects, the judgment is affirmed.


_____
Poochigian, J.

WE CONCUR:


_____
Kane, Acting P.J.


_____
Franson, J.