[No. E038743. Fourth Dist., Div. Two. Sept. 15, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON MARKEITH THOMPSON, Defendant and Appellant.

## COUNSEL

Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela Ratner Sobeck and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**RICHLI, J.**—It is a felony to have sex—including intercourse, oral sex, sodomy and digital penetration—with a person who is so developmentally disabled as to be "incapable . . . of giving legal consent," provided "this is known or reasonably should be known to the person committing the act." (Pen. Code, §§ 261, subd. (a)(1), 286, subds. (g), (h), 288a, subd. (d), 289, subds. (b), (c).) This is true even if the victim purports to consent. (*People v. Griffin* (1897) 117 Cal. 583, 585 [49 P. 711], overruled on another point in *People v. Hernandez* (1964) 61 Cal.2d 529, 536 [39 Cal.Rptr. 361, 393 P.2d 673].) Obviously, it is the proper business of the state to stop sexual predators from taking advantage of developmentally disabled people. Less obviously, however, in doing so, the state has restricted the ability of developmentally disabled people to have consensual sex.

Here, a group home for the developmentally disabled hired defendant Jason Markeith Thompson to help care for its residents, including victim Renee R. Defendant betrayed this trust by sexually violating her. Renee, who is trusting and docile, did not resist; instead, she dissociated—at trial, she was able to describe everything defendant did to her, yet she insisted that she had been "in a deep sleep." Thus, while the record leaves no doubt that she did not consent, there was some question as to whether defendant *knew* that she did not consent, and also as to whether he used force.

For this reason, the People chose to prosecute defendant on the *sole* theory that Renee was incapable of giving legal consent. Indeed, as defendant admitted performing the charged sex acts, this was the key disputed issue at trial. Renee did have some notion, albeit childlike and confused, of what sex was; in fact, she testified that she had once had sex with her developmentally disabled boyfriend, John E., and that it "[m]ade [her] feel good inside."

In this appeal, defendant contends there was insufficient evidence that Renee was incapable of giving legal consent. He also argues that, if the evidence in this case is sufficient, then the statutes involved are unconstitutionally vague. We will hold, however, that there was sufficient evidence that, at the time and under the circumstances, Renee's mental impairment, and particularly her impaired understanding of the sex acts involved, rendered her incapable of giving legal consent. This does not necessarily mean that she could never have consensual sex. Moreover, given the requirement that the

defendant either must know or should know that the victim is incapable of giving legal consent, the statutes are not unconstitutionally vague.

I

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Commission of the Crimes.*

Victim Renee R. was born with Down syndrome. As a result, she suffers from a cluster of physical deformities and disabilities, as well as mental retardation. She was living at a group home for developmentally disabled adults in La Quinta. May 7 through 8, 2004, was defendant's first day on the job as a staff member at Renee's group home.

Renee testified that at 2:00 a.m., defendant came into her bedroom while she was asleep. He took off his clothes, then got on top of her. She was wearing a nightgown but no underwear. She testified: "I felt his fingers to open my vagina and put his penis inside of me." Then he put his penis in her mouth. She did not move or say anything because she was "sound asleep."

At 3:00 a.m., defendant left. At 3:15 a.m., however, he came back and said, "Don't tell nobody about this." Renee's vagina hurt; she was "in a lot of pain." She cried "[f]or a long time."

The next morning, Renee phoned her mother and told her that defendant had "raped" and "molested" her. She sounded very upset. Her mother took her to a hospital, where Nurse Vicki Dippner-Robertson performed a sexual assault examination.

Renee was crying and distraught. In response to a series of yes-and-no questions, she indicated that her attacker had put his penis in her vagina, put his penis in her mouth, and put his mouth on her vagina; he had not put a finger in her vagina. Afterwards, he wiped himself off on her sleeping bag.

In a physical examination, Dippner-Robertson found a small tear in Renee's posterior fourchette. Dippner-Robertson testified that this is where 70 percent of sexual assault injuries occur; it indicates a forced entry. No semen was found in Renee's vagina. Some semen was found on a sleeping bag on Renee's bed. The DNA profile of the semen matched defendant's DNA profile, which would be found in less than one out of 70 trillion people.

On May 8, defendant was arrested and interviewed. At first, he said he had been asleep from 1:00 to 9:00 a.m. After the police asked him why his semen had been found on Renee's sleeping bag, however, he admitted that he went into Renee's room while on his nightly rounds. When he saw that she was not wearing any underwear, he began to "massage[]" her vagina while masturbating. He put one finger into her vagina, then three fingers. He straddled her, on his knees. He rubbed his penis against her vagina, but he denied penetrating her. He ejaculated onto the bedclothes. Defendant claimed he could not tell whether Renee was awake or not; she never said anything.

B.  *Evidence Regarding the Victim's Ability to Consent.*

Renee was three or four when she learned to speak, four or five when she learned to feed herself, and six or seven when she learned to dress herself. She had attended special education classes. She could read out loud at approximately a second-grade level but did not always understand what she read. She had gone to high school, but she had received a certificate of completion rather than a diploma.

At the time of the crimes, Renee was 34 years old. She had lived with her mother until she was 26, when she chose to move into a group home. She worked in sheltered workshops for the developmentally disabled. Her tasks included stuffing envelopes, painting ceramics, hanging up clothing and sorting books. She was paid less than minimum wage. In addition, she received Social Security disability benefits, based on her permanent mental retardation.

Despite receiving training on using public transportation, Renee could not use it on her own. She could not get a driver's license because she was unable to pass the written test or to drive without supervision. She had taken a driver's education class and had driven under supervision, but her mother characterized her driving as "[v]ery nerve[-w]racking." She was not able to cross a street at a crosswalk safely until she was about 30.

Renee could carry on a conversation, but it would be immediately apparent to her interlocutor that she was mentally impaired. Nurse Dippner-Robertson had been able to communicate with her by talking to her at the level of a nine- or 10-year-old child. Her mother described her as "naïve" and "very trusting."

Renee could add but had trouble subtracting and could not divide. She could not make change. She could not carry out banking transactions unaided. She did not understand the concept of a credit card.

Renee could not cook a meal, except for scrambling eggs, microwaving bacon, or boiling water for spaghetti. If she was left in the kitchen unsupervised for more than 15 minutes, there was a risk that "the kitchen might burn down." She had to be reminded to use soap and shampoo while taking a shower and to wear underwear. She voted, but only by copying her mother's ballot. When she needed medical care, her mother signed any necessary consent forms.

At trial, when asked what had happened to her on May 8, Renee answered, "I been raped." She defined that as "[w]hen a man wants to have sex" but she "wasn't ready to have sex" with him.

When asked what sex is, Renee kept calling it "special love." She also answered that sex is when you "fall in love, get married, have sex, get somebody pregnant and have a baby." She added that, a couple of weeks after the honeymoon, the couple can "faint" or "pass out" and get pregnant. She testified:

"Q. Do people's bodies do anything to have sex?

"A. The man's sperm, the woman's sperm, they can drop the egg and make the baby grow. And they can do childbirth.

"Q. How does the man's sperm get to the woman's sperm?

"A. It connects to the egg.

"Q. How does it get there? How does it get from the boy to the girl?

"A. The man's penis from the woman's vagina, you get his sperm inside me, it can get pregnant."

Renee was unaware of any diseases you can get from having sex. She had heard of AIDS; when asked how one gets AIDS, she answered, "When a man goes with another woman and gets somebody pregnant, it goes to somebody's wife."

Renee had a boyfriend named John E., who was also developmentally disabled. She testified that she had once had sex with John. When asked what

they did that was sex, she said John "liked to touch" her "butt," and it "[m]ade [her] feel good inside." According to Renee, when John was a baby, his testicles had been "clipped." When they had sex, she could feel his penis, but it was "hard for him to stick it inside of me." Nothing came out of his penis. Renee did not know what an erection, a "blow job," oral sex or sodomy was.

If a resident of the group home was having sex, his or her parents would be notified. Renee's mother knew she was having sex with John and had consented to their relationship.

Defense expert Dr. Morton Kurland, a psychiatrist, opined that Renee had the ability to give legal consent. He relied primarily on the fact that she had been asked to sign—and had signed—consent forms for searching her room, for keeping her full name confidential, and for conducting the sexual assault examination.

### C. Conviction and Sentence.

A jury found defendant guilty of unlawful sexual penetration (Pen. Code, § 289, subd. (b)), unlawful oral copulation (Pen. Code, § 288a, subd. (g)), sexual battery with restraint (Pen. Code, § 243.4, subd. (a)), and a lewd and lascivious act by a caretaker on a dependent person (Pen. Code, § 288, subd. (c)(2)). The trial court sentenced defendant to a total of eight years in prison.

## II

## "INCAPABLE . . . OF GIVING LEGAL CONSENT"

As noted, defendant contends there was insufficient evidence that Renee was incapable of giving legal consent.

"We often address claims of insufficient evidence, and the standard of review is settled. 'A reviewing court faced with such a claim determines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.] We examine the record to determine "whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] Further, "the appellate court presumes in support of the judgment the existence of every fact the trier could

reasonably deduce from the evidence." ' [Citation.]" (*People v. Moon* (2005) 37 Cal.4th 1, 22 [32 Cal.Rptr.3d 894, 117 P.3d 591], quoting *People v. Catlin* (2001) 26 Cal.4th 81, 139 [109 Cal.Rptr.2d 31, 26 P.3d 357], quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781], *People v. Wader* (1993) 5 Cal.4th 610, 640 [20 Cal.Rptr.2d 788, 854 P.2d 80], and *People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

■ Defendant was convicted of both oral copulation and sexual penetration with a foreign object on the theory that the victim was "at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent . . . ." (Pen. Code, §§ 288a, subd. (g), 289, subd. (b).) This was the only theory alleged in the information and the only theory on which the jury was instructed. Consent, in this context, means "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (Pen. Code, § 261.6.) Again, the jury was so instructed.

The principle that rape may be committed by having sex with a person so mentally incapacitated as to be incapable of consenting is hardly novel. "Under English common law this situation was considered no different from intercourse with an unconscious person . . . ." (2 LaFave, Substantive Criminal Law (2d ed. 2003) § 17.4(b), p. 645, fn. omitted.) In California law, the phrase "incapable . . . of giving legal consent" dates back at least as far as the original Penal Code of 1872, which defined rape so as to include "an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, . . . [¶] . . . [¶] [w]here she is incapable, through lunacy or other unsoundness of mind, whether temporary or permanent, of giving legal consent. . . ." (Former Pen. Code, § 261, as enacted Feb. 14, 1872.)

As long ago as 1897, our Supreme Court stated: "[L]egal consent presupposes an intelligence capable of understanding the act, its nature, and possible consequences. This degree of intelligence may exist with an impaired and weakened intellect, or it may not." (*People v. Griffin, supra,* 117 Cal. at p. 585.) It also stated, "Whether the woman possessed mental capacity sufficient to give legal consent must, saving in exceptional cases, remain a question of fact for the jury." (*Ibid.*) In the case before it, the court held that there was sufficient evidence that the victim was incapable of giving legal consent, based solely on the following: "[S]he had been feeble-minded from early childhood. The medical superintendent for the state home for

feeble-minded testified that she was (at the time of the trial) an inmate of his institution and was feeble-minded." (*Id.* at p. 587.)

Similarly, in *People v. Boggs* (1930) 107 Cal.App. 492 [290 P. 618], the victim was "of subnormal mentality." (*Id.* at p. 493.) Expert witnesses testified that she had the mind of a 10- or 12-year-old child. (*Id.* at p. 494.) She could cook and do housework. She had attended high school, but one of her teachers testified that she had had to repeat his class, and he had given her " 'the minimum passing grade . . . to let her go on,' " even though she had not earned it. (*Id.* at p. 493.) One expert opined that she did not have " 'sufficient mentality to protect herself from the ordinary vicissitudes of life.' " (*Id.* at p. 494.) When the victim testified at trial, she "showed considerable intelligence in fixing dates and describing places and events . . . ." (*Ibid.*) She understood what sexual intercourse was and that it could result in pregnancy. However, "her understanding . . . was essentially that of a child." (*Ibid.*) She did not understand that sexual intercourse could have "other serious consequences." (*Ibid.*) She testified that she did not resist the defendant because " '[i]f I didn't let him do it he would just stand there and wouldn't let me get anything done . . . .' " (*Ibid.*) According to an expert, " 'a child perhaps eight or twelve years of age would have done the same thing. They probably would have used the same excuse or reasoning.' " (*Ibid.*) The court held that "[w]hen all the facts are considered together," the evidence was sufficient to show that the victim was incapable of giving legal consent. (*Id.* at p. 496.)

More recently, in *People v. Mobley* (1999) 72 Cal.App.4th 761 [85 Cal.Rptr.2d 474], the defendant was convicted of sodomizing two victims (Steve and Jon) on the theory that they were unable to give legal consent. (*Id.* at p. 768.) Both victims were developmentally delayed but technically not retarded. (*Id.* at p. 778.) Steve's IQ was about 80. His ability to reason was less than that of a 14 year old. (*Id.* at pp. 777–778.) He could read, dress himself, hold down a part-time job, handle money and make purchases, vote, use a microwave, and use public transportation (though he needed help to plan his itinerary). (*Id.* at pp. 768, 776.) He had attended high school and received a certificate of completion. He had taken sex education classes and knew about heterosexual sex. (*Id.* at p. 771.) Steve could take in information, but he had trouble applying it to a new situation. (*Id.* at pp. 770–772, 778–779.) According to a prosecution expert, Dr. Steven Sparta, he had a " 'limited ability' " to make informed choices. (*Id.* at p. 778.)

Jon's IQ was around 70 or 75, which was equivalent to a mental age of 11. (*People v. Mobley, supra,* 72 Cal.App.4th at p. 779.) He had been in special

education classes. (*Id.* at p. 773.) He could read, take public transportation, hold down a job, and vote. (*Id.* at pp. 774, 777.) He had had some sex education in school. (*Id.* at p. 777.) According to Dr. Sparta, both Jon and Steve, "if presented with homosexual advances in a threatening environment[,] would have difficulty recognizing [their] options in making a choice in that situation." (*Id.* at p. 779.) He distinguished mere " 'assent' " from " 'informed consent,' " which would "requir[e] a person to agree to do something 'with enough information about what they are being asked to do' and that they do it without threat or coercion after it has been explained to them at a level they understand." (*Ibid.*)

The court found there was sufficient evidence that the victims lacked the capacity to give legal consent (*People v. Mobley, supra*, 72 Cal.App.4th at pp. 789–790): "[T]he jury . . . heard evidence of Steve's and Jon's mental impairments from Steve's and Jon's mothers and Steve's brother." (*Id.* at p. 789.) In addition, ". . . Dr. Sparta testified as to the things the jury must find for either young man to understand and give 'consent' rather than 'assent' for the acts. He found both men to be 'developmentally delayed' to the point that they would have difficulty applying what they learned and in making choices because of their disabilities. As neither young man had had [previous] sexual experiences . . . , Sparta opined both would have trouble making choices if presented with homosexual advances in a threatening environment." (*Ibid.*)

Under these cases, there was substantial evidence that Renee was incapable of giving legal consent. Indeed, defendant concedes that "there would appear to be no meaningful distinction" between the facts in *Mobley* and the facts in this case. Renee could not cook, use a bus, or do simple arithmetic. She was even more seriously disabled than the victims in *Mobley*, in that she could not hold down a real job, handle money, or cast an independent vote. She conversed at the level of a nine or 10 year old and read at the level of a seven or eight year old. Although she had attended high school, she, like the victim in *Boggs*, was not really qualified for a diploma.

Also like the victim in *Boggs*, Renee had some idea of what sexual intercourse was, including that it could result in pregnancy. However, her understanding was on the same level as the children's rhyme, "First comes love, then comes marriage, then comes a baby in a baby carriage." She did not understand that sex could result in disease. Although she had had some kind of sexual experience with John, the group home required that her mother be notified, and it had occurred with her mother's knowledge and consent. The "sex" apparently did not consist of intercourse, as John was unable to get an erection. Renee testified that John touched her buttocks; however, she

drew a distinction between a "butt" and a "vagina." Thus, the "sex" apparently did not consist of digital penetration or masturbation, either. The jury could therefore reasonably find that Renee was unequipped to consent to sexual penetration with a foreign object. Moreover, she had never heard of oral sex or a "blow job"; thus, the jury could also reasonably find that she was unequipped to consent to oral copulation, either.

Defendant points out that Renee understood the concept of rape, which she defined as "[w]hen a man wants to have sex" but she "wasn't ready to have sex" with him. The fact that she knew what consent (or lack of consent) was, however, did not conclusively prove that she was able to give it.

■ Similarly, defendant notes that he was found guilty of sexual battery, which requires a sexual touching "against the will of the person touched . . . ." (Pen. Code, § 243.4, subd. (a).) He argues that a person who can have "the 'will' _not_ to be sexually touched cannot be viewed as being incapable of giving consent to be sexually touched." We disagree. Even a severely disabled person may object to a sexual touching because he or she finds it unpleasant—a "bad touch"; this does not necessarily mean he or she could give legal consent. Moreover, as *Mobley* illustrates, a developmentally disabled person may give "assent" to a sexual touching, so that it is not against his or her will, yet be unable to give legal consent.

Defendant argues that the prosecution should be required to present expert testimony that the victim is incapable of giving legal consent. It does not appear, however, that there was any expert testimony in *Griffin*. There is a nationwide consensus that expert testimony on this issue is not required. (*Com. v. Fuller* (2006) 66 Mass.App.Ct. 84, 89–92 [845 N.E.2d 434], app. den. 447 Mass. 1102 [848 N.E.2d 1211]; *State v. Perkins* (2004) 2004 WIApp 213 [277 Wis.2d 243, 250–259 [689 N.W.2d 684]], review den. 2005 WI 1 [277 Wis.2d 153 [691 N.W.2d 354]]; *Jackson v. State* (Alaska Crim.App. 1995) 890 P.2d 587, 589–592; *State v. Summers* (1993) 70 Wn.App. 424, 428–429 [853 P.2d 953]; *State v. Kingsley* (N.D. 1986) 383 N.W.2d 828, 830–831; *Wilkinson v. People* (1929) 86 Colo. 406, 412–413 [282 P. 257].) In *Boggs*, an expert testified that the victim could not " 'protect herself from the ordinary vicissitudes of life' " (*People v. Boggs, supra,* 107 Cal.App. at p. 494), but it did not take an expert to come to the same conclusion about Renee.

Defendant, of course, through Dr. Kurland, presented expert testimony that Renee *was* capable of giving legal consent. Dr. Kurland, however, had little or no credibility. He had never met Renee. He based his opinion, more or less

exclusively, on the fact that she had signed three consent forms. Her mother, however, had also signed two of the three forms. On the stand, Renee could read the search consent form out loud but could not understand it. She could neither read *nor* understand the sexual assault examination consent form.

Dr. Kurland admitted that he "ha[d] no idea" whether Renee understood the forms. When told that she did not, he said, "[I]t doesn't surprise me," but "it doesn't change my opinion." He explained: "That's always been my opinion when I read signed documents, that whoever signed it knew what he was signing. And *that's what I'm held to when I sign something.*" (Italics added.) Thus, the jury could wholly disregard his opinion.

■ Finally, defendant argues that the prosecution should be required to prove that the victim was so "grossly disabled" as to be "unable to make choices of any kind"; otherwise, the statutes involved violate due process, because they are too vague to give notice of what is prohibited. The relevant statutes, however, require not only that the victim be "incapable . . . of giving legal consent," but also that "this is known or reasonably should be known to the person committing the act . . . ." (Pen. Code, §§ 288a, subd. (d), 289, subd. (b).) Defendant does not claim that there was insufficient evidence that he knew or should have known that Renee was incapable of giving legal consent.

This "knew or should have known" standard prevents the statutes from being unconstitutionally vague. In *In re Jorge M.* (2000) 23 Cal.4th 866 [98 Cal.Rptr.2d 466, 4 P.3d 297], the Supreme Court held that Penal Code section 12280, subdivision (b), prohibiting possession of an assault weapon, was not unconstitutionally vague. It construed the statute as requiring that the defendant either knew or should have known that the weapon had those characteristics that made it an assault weapon within the meaning of the statute. (*Jorge M.*, at pp. 869–870.) It concluded: "In cases where the information reasonably available to a gun possessor is too scant to prove he or she should have known the firearm had the characteristics making it a defined assault weapon, the possessor will not be subject to section 12280(b) as construed here. This is sufficient to protect against any significant possibility of punishing innocent possession." (*Id.* at p. 886.) Here, similarly, if there is insufficient evidence that the defendant either knew or should have known that the victim was so mentally impaired as to be incapable of giving legal consent, he or she will be entitled to an acquittal.

For much the same reason, *People v. Linwood* (2003) 105 Cal.App.4th 59 [129 Cal.Rptr.2d 73] held that a closely analogous statute—Penal Code section

261, subdivision (a)(3)—is not unconstitutionally vague. That statute prohibits sexual intercourse with "a person . . . prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, [when] this condition was known, or reasonably should have been known by the accused." The court explained: " ' "There is no formula for the determination of reasonableness." Yet standards of this kind are not impermissibly [*sic*] vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind.' [Citation.]" (*Linwood*, at p. 67, quoting *People v. Daniels* (1969) 71 Cal.2d 1119, 1129 [80 Cal.Rptr. 897, 459 P.2d 225], quoting *Go-Bart Importing Co. v. United States* (1931) 282 U.S. 344, 357 [75 L.Ed. 374, 51 S.Ct. 153].)

It continued: "Can a jury determine whether a defendant reasonably should have known that a person's level of intoxication was such as to prevent him or her from resisting an act of sexual intercourse? Yes. As our Supreme Court said . . . , in countering the argument that 'the reasonably should have known' language of the statute was too vague a standard: 'This argument is troubling only if one believes the average juror is unable to ascertain and apply the meaning of "reasonably should have known" in the instruction reiterating the statutory language. We doubt this is the case. . . . Moreover, the average juror has the ability to cull from everyday experience a standard by which to assess the ability of a defendant to know the status of his or her victim.' [Citation.] Similarly, we conclude jurors are able to resolve the factual issue of whether a defendant reasonably should have known that a given victim was too intoxicated to resist an act of sexual intercourse. [Citation.]" (*People v. Linwood, supra,* 105 Cal.App.4th at p. 68, quoting *People v. Rodriguez* (1986) 42 Cal.3d 730, 782 [230 Cal.Rptr. 667, 726 P.2d 113].)

A lay juror is equally able to resolve the same issue with respect to a victim's mental disability. "The question whether a person possesses sufficient resources—intellectual, emotional, social, psychological—to determine whether to participate in sexual contact with another is an assessment within the ken of the average juror, who likely has made the same determination at some point." (*People v. Cratsley* (1995) 86 N.Y.2d 81, 87 [629 N.Y.S.2d 992, 653 N.E.2d 1162], fn. omitted.)

It could, of course, be argued that *Linwood* is distinguishable on either of two grounds. First, it could be argued that a perpetrator is in a better position to assess a victim's ability to resist than a victim's ability to consent (or to refuse consent). However, because resistance by the victim is not an element of rape or similar sexual offenses (see *People v. Barnes* (1986) 42 Cal.3d 284,

302–303 [228 Cal.Rptr. 228, 721 P.2d 110]), the ability to resist and the ability to refuse consent are essentially one and the same. (*People v. Avila* (2000) 80 Cal.App.4th 791, 798 [95 Cal.Rptr.2d 651].) Second, it could be argued that an average person is more familiar with the effect of intoxication on the ability to consent than he or she is with the effect of retardation on the ability to consent. Even if so, between everyday experience and the evidence that will be presented on this issue at a trial, a juror can cull the applicable standard for whether the defendant knew or should have known that the victim was unable to consent.

Defendant argues, however, that if Renee was incapable of giving legal consent, then it must be a crime not only for defendant, but for anyone (including John) to have sex of any kind with her. At trial, when the prosecutor was confronted with this argument, she replied that John was probably too developmentally disabled to have the necessary mens rea. That is not at all clear from the record, which indicates that John functioned at a somewhat higher level than Renee did. The argument, in any event, goes beyond just John.

We do not agree, however, that Renee's incapacity to consent in this case necessarily debars her from all future consensual sexual activity. The relevant statutes require proof that the victim was "*at the time* incapable . . . of giving legal consent . . . ." (Pen. Code, §§ 288a, subd. (g), 289, subd. (b), italics added.) "It is important to distinguish between a person's *general* ability to understand the nature and consequences of sexual intercourse and that person's ability to understand the nature and consequences at a given time and in a given situation." (*State v. Ortega-Martinez* (1994) 124 Wn.2d 702, 716 [881 P.2d 231].) For example, in *Mobley*, the expert testified that the victims would be unable to give legal consent to sexual activity under the particular circumstances—"homosexual advances in a threatening environment." (*People v. Mobley, supra*, 72 Cal.App.4th at p. 779.) Here, it is relevant that defendant was one of Renee's caretakers and that he exploited her vulnerability, the very type of harm the statute seeks to guard against. (See *People v. Cratsley, supra*, 86 N.Y.2d at p. 88.) It is also relevant that she was, in fact, unable to express either consent or refusal; instead, she convinced herself that she was asleep. Finally, we note that, even assuming Renee would be incapable of giving legal consent under any circumstances, that fact would not render the statute vague in any way.

██ We therefore conclude that there was sufficient evidence that Renee was incapable of giving legal consent. We further conclude that the requirement that the victim must be "incapable . . . of giving legal consent" is not unconstitutionally vague.

## III

## DISPOSITION

The judgment is affirmed.

Hollenhorst, Acting P. J., and King, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 20, 2006, S147388.