Filed 11/12/25  P. v. Love CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B337290 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA498866) |
| v. | |
| THOMAS JAMES LOVE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig Richman, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Thomas James Love appeals from the judgment of conviction after a jury found him guilty of eight counts of rape of his granddaughter D.L.,[1] a person incapable of giving legal consent because of a developmental disability, and four counts of committing lewd or lascivious acts on his granddaughter A.L., a child who was under 14 years of age. As to one of the counts involving A.L., the jury found true a special circumstance that Love kidnapped A.L. and the movement substantially increased the risk of harm to A.L. over and above that level of risk necessarily inherent in the underlying offense, within the meaning of the "One Strike" law.

Love contends substantial evidence does not support the jury's finding that D.L. had a developmental disability that prevented her from legally consenting to sexual intercourse with Love. He also contends substantial evidence does not support the jury's true finding on the special circumstance with respect to the charge concerning A.L. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Evidence At Trial Regarding Sexual Abuse of D.L.*
    1.    *D.L.'s intellectual disability*
    D.L. is intellectually disabled. She initially attended Dubnoff Valley High School, which served only students with "significant" disabilities. At 16 years old, D.L. moved to Vista Del Mar, a group home for people with disabilities. From ages 18 to 21, D.L. lived at Lilly's Open Arms, an adult residential facility

---

[1]    We refer to the victims by their first and last initials to protect their privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4).)

for "Regional Center clients," meaning individuals with "some type of intellectual or mental disability."[2]  The staff at the facility assisted the residents with "their everyday basic needs."  At age 18, because D.L. "was not prepared to enter the working world," D.L. was enrolled in Hawthorne Academy, a school for young adults ages 18 to 21 who have "some type of mental or development behavioral issues."  At Hawthorne Academy, D.L. took job training classes and had a job "[h]elping little kids" with their homework.  D.L. helped with their English homework because, as she stated, "I didn't know how to do math."

Dr. Karen Hastings, a psychologist who worked for two Regional Centers, testified that in 2018, when D.L. was 17 years old and in the 11th grade, Hastings tested D.L.'s cognitive ability. To determine D.L.'s mental capacities, Hastings administered several standardized tests, reviewed D.L.'s records, and reviewed D.L.'s history.  Hastings concluded that D.L. "was intellectually disabled in the mild range," which is generally a "lifelong" condition.

D.L.'s I.Q. was 63, which "was quite low" and "only . . . better than 1 percent of the whole population."  D.L.'s "grade equivalent was very low."  Her sentence comprehension was at the third-grade level and math computation was at the first to second-grade level.  D.L.'s communication score was in the mildly delayed range, and her daily living and social skills were in the borderline delayed range.  Also, D.L.'s overall adaptive skills capacity score, which refers to skills "we all [use] in life . . . like conceptual, social[,] and practical," was 71, which "was low."

---

[2]  Regional Centers are nonprofit agencies that provide "lifelong resources" to people with disabilities.

3

Hastings testified that D.L. was "substantially disabled" in that she had impairment in several areas of functioning. D.L. had difficulty in and needed support with conceptual skills, including academic, reading, writing, math, and abstract reasoning. She "require[d] support to apply what she knew functionally." Socially, she was "immature." This meant she could "converse but [her] language and communication [wa]s at a simpler level." She also had "difficulties with social judgment" and could "clearly be taken advantage by others."

D.L. could bathe, shower, and get dressed by herself but needed help with more complex daily skills, such as grocery shopping and preparing food. "[I]t [was] possible that [she could] be trained to do a job but it would be a job that didn't emphasize conceptual skills," such as "[s]tocking things in a grocery store . . . [a]s opposed to working at the register."

2. *Sexual Abuse of D.L.*

Beginning when D.L. was 14 years old to when she was 21 years old, Love sexually abused her. When D.L. was 14 years old, she lived with her mother. Two to three times a week, Love came over to D.L.'s home after school and had sex with her. They would have sex in motels or at D.L.'s home when no one else was there.

When D.L. moved into a group home at age 16, Love visited her multiple times a month and had sex with her in his car during each visit. Sometimes Love asked D.L. to perform oral sex on him. D.L. did not want to, but she did it anyway because she thought if she refused, Love would stop loving her and giving her things, such as money and jewelry.

When D.L. moved into an adult facility at age 18, Lilly's Open Arms, Love came to the facility every day or weekend. He

4

would pick up D.L. and drive her to various places where they would have sex.

When D.L. was 21 years old, D.L. went to the police station with her direct care worker from Lilly's Open Arms and met with Los Angeles Police Detective Brandon Bourgeois. Bourgeois testified that D.L. "noticeably [had] some sort of disability." According to Bourgeois, the way she spoke was "more child-like."

D.L. told Bourgeois that she had sex with Love starting when she was 14 or 15 years old and continuing while she lived at Lilly's Open Arms. D.L. described the sex as "contact between . . . her vagina [and Love's] penis" and stated it occurred "two to three times a week." In exchange for having sex with Love, Love would give D.L. clothes, jewelry, and other gifts.

Bourgeois took D.L. to be interviewed at Stuart House, a facility that specializes in forensic interviews of children who are victims of sexual assault. He chose Stuart House because it was clear to Bourgeois that D.L. "suffered from a developmental disability and that her cognitive ability . . . [was] that of a child." During the interview, D.L. initially recanted a majority of what she reported to Detective Bourgeois in August. However, at some point, D.L. said, " 'I'm going to tell the truth.' " She stated, " 'The truth is, we did have sexual intercourse but at the same time . . . it wasn't because we did it just to do it.' " D.L. referred to Love as her boyfriend and said that "she was very much in love with him."

3.    *D.L.'s Understanding of Sex*

At trial, D.L. testified regarding her understanding of sex. When asked during direct examination what sex was, D.L. answered, "I don't know, having intercourse with somebody else." She described intercourse as "[h]aving . . . contact with

5

somebody" and "[i]nteracting with other people." The prosecutor stated, "Well, you and I are interacting[.] [A]re we having – sexual intercourse?" D.L. replied, "No, no." The prosecutor then said, "So what does sexual intercourse mean to you?" D.L. responded, "I do not know." D.L. acknowledged that she had previously testified at a hearing that sex meant "one person putting their private part in another person." But when asked to elaborate on that definition, D.L. answered, "I do not know what you're talking about."

The prosecutor also asked D.L. what it meant to have sex with her grandfather. D.L. said, "Well it means two people having a relationship with each other and making . . . contact with people." The prosecutor later asked D.L. "What did you do [with your grandfather]? I need you to talk to me about specifics." D.L. said, "[H]e unzipped his pants and we had sex in the car." She said that she "lea[ned] over and . . . started sucking on his penis and [they] had intercourse in the car."

D.L. testified that she took a sex education class in sixth grade where she learned what sex was and that sex could lead to getting pregnant. She further testified that from 16 to 18 years old, she had sex with four different people. There were times when she did not want to have sex with the men, but she "was scared to speak [her] mind." At the time of trial, D.L. had two children, ages six and three, and was pregnant with a third child. Her mother had custody of her two children.

B.    *Evidence at Trial Regarding Sexual Abuse of A.L.*[3]

Love sexually abused A.L. from when she was eight to 11 years old.  During this time period, A.L. visited Love's home every weekend.  A.L.'s grandmother and father also lived there.  During one visit, when she was eight years old, A.L. was in the bathroom with Love and was getting ready to take a bath.  Love stuck his finger inside her vagina and told her "it was dirty."

During another visit, when A.L. was eight or nine years old, Love drove A.L. to a thrift store after A.L. accidentally urinated on herself.  They bought some new clothes from the store and returned to Love's car.  Inside Love's car, A.L. undressed from the waist down.  Love told her to open her legs and "[h]e just looked at [her]" for several minutes.

On one occasion, Love drove A.L. to her mother's house after A.L. spent the weekend at Love's home.  While they were in the car, Love told her to give him a kiss on the mouth, which she did.  He then asked her if she would be his girlfriend.

A couple of times a month, during A.L.'s visits to Love's home, Love drove A.L. to various places.  Love would tell A.L.'s father or grandmother that they were "going someplace" specific.  However, as A.L. testified, "that's not what [they] would do."  They went "nowhere.  Just away from the home."  By "nowhere," A.L. meant that they "would [not] go to where . . . [Love] said [they] were going to go."  Instead, Love "pull[ed] over and park[ed] somewhere[,] not a specific location."  Because it became

---

[3]    The court deemed A.L. unavailable to testify, and the People read her prior testimony from the preliminary hearing into the record.  Love does not challenge the court's finding regarding A.L.'s unavailability on appeal.

7

"a consistent thing," A.L. did not really think they were going someplace specific.

When they arrived at the various locations, Love sometimes told A.L. to take her clothes off. Other times, A.L. took her clothes off without Love's prompting because "it was so frequent that [she knew] that's what [she was] supposed to do." Once A.L. was naked, Love looked between her legs. On one occasion, Love used his hands to spread her legs apart. A.L. did not want to go with Love on these outings. She was afraid, but she did not "feel that [she] could say no" because he was "an adult and [she] was always taught to do what an adult says."

C.     *Verdict and Sentencing*

The jury found Love guilty of eight counts of rape of D.L., a person who was incapable of giving legal consent because of a developmental disability (Pen. Code, § 261, subd. (a)(1); counts 1-4, 9-12),[4] and four counts of committing lewd or lascivious acts on A.L., a child who was under 14 years old (§ 288, subd. (a); counts 13-16). The jury also found true a special circumstance that, as to count 14, Love kidnapped A.L. and the movement substantially increased the risk of harm to A.L. over and above that level of risk necessarily inherent in the underlying offense. (§ 667.61, subds. (a), (d)(2).)

As to count 14, the lewd act on A.L. with a special circumstance, the trial court sentenced Love to an indeterminate term of 25 years to life under the One Strike law. (§ 667.61,

---

[4]     Further statutory references are to the Penal Code. The eight rape counts include both time periods when D.L. was a minor and when she was over 18 years old.

subds. (a), (d)(2).)  The court also sentenced Love to a consecutive determinate term of 26 years for the remaining counts.

Love timely appealed.

## DISCUSSION

Love contends substantial evidence did not support the jury's finding that D.L.'s disability prevented her from consenting to sexual intercourse with him.  He also argues substantial evidence did not support the jury's true finding on the special circumstance with respect to the kidnapping charge involving A.L.  We reject his contentions.

A.    *General Legal Principles*

In reviewing a challenge to the sufficiency of the evidence, we apply the substantial evidence standard.  (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117.)  "The same standard of review applies to the sufficiency of the evidence supporting special circumstance findings."  (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)  Under this standard, " ' "we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' "  (*Ramirez*, at pp. 1117-1118.)

"Substantial evidence also ' "includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' "  (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) " ' " '[I]f the circumstances reasonably justify the jury's findings,

the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility." ' " (*People v. Ramirez, supra,* 13 Cal.5th at p. 1118.)

B. *Substantial Evidence Supports the Jury's Finding That D.L. Lacked the Capacity To Consent*

1. *Applicable law*

Section 261, subdivision (a), defines rape as "an act of sexual intercourse accomplished under any of the following circumstances: [¶] (1) If a person . . . is incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act. . . . [T]he prosecuting attorney shall prove, as an element of the crime, that a mental disorder or developmental or physical disability rendered the alleged victim incapable of giving consent." A person is incapable of giving legal consent if he or she is " 'unable to understand the act, its nature, and possible consequences.' " (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1416 (*Miranda*); see *People v. Lewis* (1977) 75 Cal.App.3d 513, 519.)

"By itself, the existence of actual consent is not sufficient to establish a defense to a charge of rape. That the supposed victim actually consented to sexual intercourse disproves rape only if he or she had 'sufficient capacity' to give that consent. [Citations.] For example, if the victim is so unsound of mind that he or she is incapable of giving legal consent, the fact that he or she may have given actual consent does not prevent a conviction of rape."

(*People v. Giardino* (2000) 82 Cal.App.4th 454, 460; see *People v. Thompson* (2006) 142 Cal.App.4th 1426, 1429 (*Thompson*).)

"The existence of capacity to consent is a question of fact." (*Miranda*, *supra*, 199 Cal.App.4th at p. 1413; see *Thompson*, *supra*, 142 Cal.App.4th at p. 1435 [whether an individual possesses " 'mental capacity sufficient to give legal consent must, saving in exceptional cases, remain a question of fact for the jury' "].) Determining lack of capacity to consent does not require expert testimony (*Thompson*, at p. 1437) or "call for any particular type of clinical diagnosis." (*People v. Lewis*, *supra*, 75 Cal.App.3d at p. 519). Rather, "[a] lay juror is able to assess the extent of a victim's mental disability." (*Miranda*, at p. 1413; see *Thompson*, at p. 1439 [" 'The question whether a person possesses sufficient resources—intellectual, emotional, social, psychological—to determine whether to participate in sexual contact with another is an assessment within the ken of the average juror, who likely has made the same determination at some point.' "].)

    2.    *Analysis*

Substantial evidence supports the jury's finding that because of D.L.'s intellectual disability, she was unable to understand the sexual acts with Love, the nature of the acts, and the possible consequences. At the time of the sexual acts, D.L. had an intellectual disability that substantially impaired her functioning. She attended schools and lived in group homes that specifically served people with disabilities and received Regional Center services. Her IQ of 63 was "quite low" and "only . . . better than 1 percent of the whole population." By 11th grade, her actual grade performance was "very low": she read at a third-grade level and her math skills were at a first or second-grade

11

level.  She was socially immature, lacked judgment, and appeared "child-like."  Further, despite being 21 years old, police interviewed D.L. at a forensic facility for children because of her apparent developmental disability.  Given the totality of this evidence, the jury could reasonably infer that D.L. lacked the capacity to consent.  (See *Miranda*, *supra*, 199 Cal.App.4th at p. 1416 [substantial evidence supported finding that victim was incapable of giving consent due to her disability where victim "had trouble walking and talking"; "attended special education and needed assistance at night"; and had a condition that "caused the investigating officer to have her interviewed at the Children's Advocacy Center instead of being interviewed by the detective or prosecutor"]; *Thompson*, *supra*, 142 Cal.App.4th at p. 1436 [same where victim attended high school but "was not really qualified for a diploma"; "could not hold down a real job, handle money, or cast an independent vote"; and "conversed at the level of a 9 or 10 year old and read at the level of a 7 or 8 year old"]; *People v. Hillhouse* (2003) 109 Cal.App.4th 1612, 1616, 1623 [evidence was sufficient that 14-year-old victim's disability rendered him incapable of consenting to sexual acts where his I.Q. was under 70, he had always been in special education classes and was a Regional Center client, he had math and reading skills of a third grader and writing skills of a second grader, and he communicated at the level of an elementary-school-aged child].)

D.L.'s difficulty at trial in answering questions about sex further supports the conclusion that she lacked the capacity to consent.  Although D.L. testified that she took a sex education class in sixth grade and her description of the sex acts with Love demonstrated that she "had some idea of what sexual intercourse was," she struggled to formulate responses to general and basic

questions about sex. (*Thompson*, *supra*, 142 Cal.App.4th at p. 1437 [jury could reasonably find victim was "unequipped to consent" to sex even though she had some idea of what sexual intercourse was].) She described intercourse as "[h]aving . . . contact with somebody" and "[i]nteracting with other people." When pressed further on the definition, she replied, "I do not know." A reasonable jury could infer that D.L.'s inability to articulate the meaning of sexual intercourse demonstrated that she "was not capable of appreciating what took place or freely and voluntarily participating in the acts." (*Miranda*, *supra*, 199 Cal.App.4th at p. 1415 [victim gave "childlike description at trial of the sexual assault"]; see *Thompson*, at pp. 1436-1437 [victim's understanding of sexual intercourse "was on the same level as the children's rhyme, 'First comes love, then comes marriage, then comes a baby in a baby carriage' "].)

Love argues the evidence was insufficient to support the jury's finding that D.L. lacked the capacity to consent because D.L. "had sex with four different men" and "gave birth twice." Evidence of D.L.'s past sexual acts with others does not demonstrate that she had the capacity to consent to those past acts. And in any event, " '[i]t is important to distinguish between a person's *general* ability to understand the nature and consequences of sexual intercourse and that person's ability to understand the nature and consequences at a given time and in a given situation.' " (*Thompson*, *supra*, 142 Cal.App.4th at p. 1440.) The jury could have reasonably inferred that D.L. lacked the capacity to consent when considering the grandparent-grandchild relationship and significant age gap between D.L. and Love. (See *ibid*. ["it is relevant that defendant was one of [the victim's] caretakers and that he exploited her vulnerability, the

very type of harm the statute seeks to guard against"]; *People v. Mobley* (1999) 72 Cal.App.4th 761, 789, disapproved on other grounds in *People v. Trujillo* (2006) 40 Cal.4th 165, 181, fn. 3 [victims lacked capacity to consent to sexual "advances in a threatening environment"].)

Love further argues that D.L. "made a conscious decision . . . to have sex with [Love]." However, evidence that D.L. may have assented to sexual intercourse is not evidence that she had the capacity to give legal consent. (*People v. Vukodinovich* (2015) 238 Cal.App.4th 166, 176 ["While defendant points out that on redirect examination L. said she wanted to have sex with defendant, '[a] little bit, not a lot' and that she wanted sex because, '[i]t's good,' these facts do not prove capacity to give legal consent. What appears to be consent from somebody who lacks capacity to consent is, in effect, nothing at all."]; *Thompson, supra*, 142 Cal.App.4th at p. 1437 ["a developmentally disabled person may give 'assent' to a sexual touching, so that it is not against his or her will, yet be unable to give legal consent"].)

Love also points to evidence that he contends demonstrates D.L.'s capacity to consent, including that D.L. was able to hold down a job, understood and could follow instructions during her psychological examination, and was able to name all the areas where the sex acts occurred. "This is no more than a request that we reweigh the evidence, which we will not do. As required, we view the evidence in the light most favorable to the judgment, drawing all inferences in support of the verdicts." (*Miranda, supra*, 199 Cal.Ap.4th at p. 1416 [defendant argued there was evidence victim could communicate with brother and was a high school sophomore, indicating she had mental capacity to consent].) Based on our review of the whole record, we conclude

there is sufficient evidence that D.L. lacked the capacity to consent.

B.  *Substantial Evidence Supports the Jury's True Finding on the Special Circumstance under Section 667.61*

      1.  *Applicable law*

As to count 14 (a lewd act on A.L. committed between September 14, 2002 and September 13, 2003), the jury found true the special circumstance under section 667.61 that Love kidnapped A.L. and the movement substantially increased the risk of harm to A.L. over and above that level of risk necessarily inherent in the underlying offense.  During the specified time period, A.L. was nine to 10 years old.  The parties agree that count 14 applies to any of the three incidents where Love abused A.L. in his car.

Section 667.61, the so-called One Strike law, "sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes." (*People v. Mancebo* (2002) 27 Cal.4th 735, 741.)  "The statute is designed 'to ensure serious sex offenders receive lengthy prison sentences upon their first conviction when their crimes are committed under circumstances elevating their victim's vulnerability.' " (*People v. Waqa* (2023) 92 Cal.App.5th 565, 577 (*Waqa*).)  Under section 667.61, subdivision (a), a person who is convicted of committing an enumerated sex offense, which includes Love's conviction for committing a lewd or lascivious act on A.L. (§ 667.61, subd. (c)(8)), "shall be punished by imprisonment in the state prison for 25 years to life" if "one or more of the circumstances specified in subdivision (d)" are present (§ 667.61, subd. (a)).  The jury found true the presence of the circumstance specified in section 667.61,

15

subdivision (d)(2), which states, "The defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense."

"The section 667.61, subdivision (d)(2) qualifying circumstance has two elements. The first element requires the victim be kidnapped. The second element requires that the victim's movement *substantially increase the risk of harm* to him or her above that level of danger necessarily inherent in the sex offense. [Citation.] Section 667.61, subdivision (d)(2) contains an element (substantial increase in the risk of harm) beyond that in simple and aggravated kidnapping." (*People v. Adams* (2018) 28 Cal.App.5th 170, 189.)

As to the first element that the defendant have kidnapped the victim, the trial court here instructed the jury on aggravated kidnapping for the purpose of child molestation in violation of section 207, subdivision (b). Subdivision (b) provides: "Every person, who for the purpose of committing any act defined in section 288, hires, persuades, entices, decoys, or seduces by false promises, misrepresentations, or the like, any child under the age of 14 years to go out of this country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (b).) Under section 207, subdivision (b), the People must prove that (1) the defendant persuaded, hired, enticed, decoyed, or seduced by false promises or misrepresentations a child under the age of 14 years old to go somewhere; (2) when the defendant did so, he or she intended to commit a lewd or lascivious act on the child; and (3) as a result of the defendant's conduct, the child was moved a substantial distance. (§ 207, subd. (b); *Waqa, supra,*

16

92 Cal.App.5th at pp. 576-577; *People v. Robertson* (2012) 208 Cal.App.4th 965, 983 (*Robertson*).)  A substantial distance means the movement " 'must not be "merely incidental" ' " to the underlying offense.  (*Robertson*, at p. 983.)  Also, the movement must increase the risk of physical or psychological harm to the victim over and above that necessarily present in the underlying offense.  (*Ibid.*)

　　To determine whether the movement is more than merely incidental, "the jury considers the 'scope and nature' of the movement."  (*People v. Rayford* (1994) 9 Cal.4th 1, 12.)  "This includes the actual distance a victim is moved," but there is "no minimum number of feet a defendant must move a victim in order to satisfy" this requirement.  (*Ibid.*)  " '[I]ncidental movements are brief and insubstantial, and frequently consist of movement around the premises where the incident began. [Citations.]  By contrast, relatively short distances have been found not to be incidental where the movement results in a substantial change in "the context of the environment." ' " (*Waqa, supra*, 92 Cal.App.5th at p. 578.)

　　"In determining whether a movement increased the risk of harm to the victim, the jury considers ' " 'such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes.  [Citations.] The fact that these dangers do not in fact materialize does not . . . mean that the risk of harm was not increased.' " ' "  (*Waqa, supra*, 92 Cal.App.5th at p. 580.)

　　To summarize, where the special circumstance under section 667.61, subdivision (d)(2), incorporates aggravated kidnapping under section 207, subdivision (b), the movement

17

element of the special circumstance "requires proof that '(1) the movement was substantial in character, and not merely incidental to the commission of the sex crime [citation], and (2) "the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying" sex offense.' [Citations.] These two prongs 'are not distinct, but interrelated, because a trier of fact cannot consider the significance of the victim's changed environment without also considering whether that change resulted in an increase in the risk of harm to the victim.' " (*Waqa*, *supra*, 92 Cal.App.5th at p. 579.)

2. *Analysis*

Love contends substantial evidence does not support the jury's true finding on the special circumstance under section 667.61, subdivision (d)(2), because "[t]here was no evidence of force, fraud[,] or deception," the movement in Love's car "was incidental to the crime," and "[t]he movement also did not increase the risk of harm beyond that for the underlying offense." We are not persuaded by any of his points.

Preliminarily, the special circumstance under section 667.61, subdivision (d)(2), does not require force. It applies to any kind of kidnapping (§ 667.61, subd. (d)(2)), including kidnapping by force or fear *or* by deception with the intent to commit a lewd act on a child. (§ 207, subds. (a), (b).) Nor does aggravated kidnapping for the purpose of child molestation require force. (§ 207, subd. (b); *People v. McCurdy* (2014) 59 Cal.4th 1063, 1105, fn. 15.) As noted, a defendant is guilty of such aggravated kidnapping if he "hires, persuades, entices, decoys, or seduces by false promises, misrepresentations, or the like, any child." (§ 207, subd. (b).)

18

As to Love's argument that Love employed no fraud or deception on A.L., the record contains substantial evidence that Love persuaded A.L. by "misrepresentations, or the like" to go places with him, as section 207, subdivision (b), requires. (§ 207, subd. (b).) There is evidence that when A.L. visited Love's home on the weekends, Love drove her to various places a couple of times a month, and when they arrived, Love committed lewd or lascivious acts on her. Love would say he was taking her someplace specific, but as A.L. testified, "that's not what [they] would do." They went "nowhere. Just away from the home." By providing false accounts of where he was taking her, Love misrepresented his intentions. This conduct supports the jury's finding on the special circumstance. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 86, 155 [defendant's ruse to get child in his car satisfied elements of section 207, subdivision (b), where he "approached her in his car, told her he was a teacher, and asked her for help moving some books," but after getting her into his car, he drove her to a motel to commit child molestation].)

Love contends he did not deceive A.L. because he provided the false accounts to her family, not her. A.L. testified that Love usually made the misrepresentations to her father. But A.L. was only nine or 10 years old during the time period at issue, and thus A.L. was not in charge of her own comings and goings. Misrepresentations about where Love was taking A.L. made to A.L.'s parent or other grownup in charge of her satisfy the requirement under section 207, subdivision (b), that Love have employed some kind of deception. In any event, A.L. overheard those misrepresentations made to the grownups in charge of her. Thus, the jury could have reasonably concluded that Love indirectly misled A.L. And while Love asserts A.L. "knew what

19

would happen when going inside his car" and thus was not personally deceived, A.L.'s testimony that she and Love were not going to the places he said they were going implies Love tricked her at some point and that A.L. only learned of his true intentions after their outings became "a consistent thing."

Turning to Love's arguments regarding the movement of A.L., there is sufficient evidence that the movement was not merely incidental. First, the fact that the movement was unnecessary to commit the lewd and lascivious acts supports the jury's finding that the movement was not merely incidental. A sexual act " ' "does not necessarily require movement to complete the crime." [Citation.] Where a defendant drags a victim to another place, and then attempts a [sexual act], the jury may reasonably infer that the movement was neither part of nor necessary to the [act]' such that the movement was not incidental." (*Waqa, supra*, 92 Cal.App.5th at p. 584.) Love could have committed the sex acts in his home. Thus, because Love moved A.L. to a place away from his home and committed the sexual acts there, there was substantial evidence that the movement was not merely incidental to the crime. (See *ibid*; *People v. Salazar* (1995) 33 Cal.App.4th 341, 347 [jury could reasonably conclude movement of victim was not merely incidental where defendant "could have raped [victim] on the walkway outside the motel room door and avoided moving her at all"].)

In addition, by moving A.L. away from his home and to various random locations, Love substantially increased the risk of harm to her. "Any determination of the increase in the risk of harm involves a comparison of the victim's physical location before and after the asportation." (*People v. Salazar, supra,*

20

33 Cal.App.4th at p. 348.)  Here, the incident began in Love's home where A.L. spent every weekend and where her father and grandmother lived.  The jury could have reasonably inferred from these facts that A.L. was comfortable at Love's home and "was potentially visible to, and within hearing distance of," her close family members.  (*Ibid.* [victim was potentially visible to "motel patrons, employees, and even the general public" before defendant "dragged her into the privacy and seclusion of a motel room"].)  From this location, Love put her in his car and drove her to various, random locations away from his home.  Once inside his car, the likelihood of anyone detecting his sexual abuse of A.L. decreased.  (See *People v. Kelly* (2016) 245 Cal.App.4th 1119, 1130 [defendant's "movement of the victim—from the grassy area near a relatively public setting into the isolation of his vehicle—decreased the likelihood of his detection"].)

Further, moving A.L. to other locations involved a significant change in environment for her.  It separated her from other close family members and took her to unfamiliar places.  For a young child of eight to 11 years old, such a change would make A.L. particularly vulnerable.  (See *People v. Singh* (2019) 42 Cal.App.5th 175, 188 [change in environment was "significant" because defendant moved two-year-old away from mother to another environment where no one knew child and child knew no one].)  The jury could infer that such vulnerability substantially increased the risk of harm to A.L. because it enhanced Love's opportunity to gain control over her and commit additional crimes.  (Cf. *Waqa*, *supra*, 92 Cal.App.5th at pp. 580-583 [no substantial evidence that movement substantially increased risk of harm where defendant moved victim from one small stall in a public restroom to an adjacent large stall because "the degree of

21

concealment each stall offered did not significantly differ"]; *People v. Perkins* (2016) 5 Cal.App.5th 454, 470 [same where defendant moved victim from a bathroom to a bedroom of a "small private . . . apartment" because "[t]he movement was for a short distance inside a private residence from one room to another"].)

Substantial evidence supports the special circumstance under section 667.61, subdivision (d)(2).

## DISPOSITION

The judgment is affirmed.


STONE, J.

We concur:


MARTINEZ, P. J.


FEUER, J.

22